Larry MARSHAK, Plaintiff–
Counterclaim Defendant,

v.

Faye TREADWELL, Treadwell's Drift-
ers, Inc., and the Drifters, Inc. De-
fendants–Counter claimants.

No. CIV. 95–3794 (NHP).

United States District Court,
D. New Jersey.

July 30, 1999.

552

Mark J. Ingber, Waters McPherson McNeill, Secaucus, NJ, for Plaintiff–Counterclaim Defendant.

James P. Flynn, Epstein Becker & Green, Newark, NJ, for Defendants–Counterclaimants.

## OPINION

POLITAN, District Judge.

This matter comes before the Court on cross-motions for judgment as a matter of law and for a new trial pursuant to Federal Rules of Civil Procedure 50(b) and 59. The Court heard oral argument on April 9, 1999. For the reasons explained below, plaintiff Marshak's motions are DENIED and defendant Treadwell's motions are GRANTED IN PART.

### *FACTUAL BACKGROUND*

### I. The Litigation

This lawsuit arises out of a trademark dispute involving the musical group "The Drifters." The plaintiff Larry Marshak owned a federal trademark registration for the name "The Drifters," which he acquired through a 1976 assignment from three former Drifters singers, Charlie Thomas, Elsbeary Hobbs, and Dock Green. Since the assignment, Marshak has continuously used the mark in connection with his promotion of Drifters performances. In 1995, Marshak filed the instant Complaint alleging that Faye Treadwell had infringed and disparaged Marshak's federal trademark registration.[1]

---

1. The Drifters, Inc. and its successor corporation, Treadwell's Drifters, Inc., are also named as defendants. Faye Treadwell was the sole shareholder of The Drifters, Inc. in 1976, when she transferred the company's assets to her new corporation, Treadwell's Drifters, Inc., and allowed The Drifters, Inc. to lapse as a corporate entity. All record royalties previously being paid to The Drifters, Inc. are now paid to Treadwell's Drifters, Inc. or to Faye Treadwell.

As a defense to Marshak's infringement action, Treadwell alleged, and ultimately proved, that Marshak's federal registration had been obtained by fraud. Treadwell also proved that she and her late husband George Treadwell had owned and managed the original Drifters group since 1955. With regard to Treadwell's infringement counterclaim, however, the jury found that she had abandoned her trademark rights in or about 1976, when her group stopped performing regularly in the United States. Because Marshak's Drifters group has performed continuously since the early 1970s, the jury found that Marshak acquired common law trademark rights in 1976.

## II. The Drifters: 1954 to 1969

The Drifters first appeared in New York in 1953. Shortly thereafter, in 1954, the group came under the management of George Treadwell, who had previously managed other musicians, including Sammy Davis, Jr., Billie Holiday, and Sarah Vaughn. Mr. Treadwell managed the group through The Drifters, Inc., a New York corporation that he formed in 1954. He married the defendant Faye Treadwell in March of 1955.

Although Mr. Treadwell owned all of The Drifters, Inc. stock, he managed the company with his two partners, Irving Nahan and Lewis Lebish.[2] Mr. Lebish acted as the accountant and bookkeeper for The Drifters, Inc. Treadwell, assisted by his wife Faye and Irving Nahan, managed the entertainment side of the business. Together, they exercised complete artistic control over The Drifters: they hired and fired Drifters singers; they paid the singers a weekly salary; they selected the music and arrangements; and they made all musical and business decisions relating to both live performances and recording contracts.

Since the group's inception, The Drifters has always been comprised of a constantly changing cast of singers, including Ben E. King, Rudy Lewis, and Johnny Moore. During George Treadwell's stewardship, each Drifters singer was an employee of The Drifters Inc., and each of them signed a written employment contract and received a weekly salary.

In about 1959, Treadwell hired several singers from a group called "The Crowns." Three of these replacement singers were Charlie Thomas, Elsbeary Hobbs, and Dock Green. Thomas, Hobbs, and Green signed employment contracts with The Drifters, Inc. and they performed and recorded as members of The Drifters under Treadwell's exclusive management. Hobbs left the group less than two years later in 1961. Green left in 1964.

The Drifters continued to perform live concerts and record new music through most of the 1960s. The Drifters recorded dozens of original songs, many of which were "Top Ten Hits" on Billboard's Rhythm and Blues Charts. These included "There Goes My Baby" (1959), "Save the Last Dance for Me" (1960), "Some Kind of Wonderful" (1961), "Up on the Roof" (1962), "On Broadway" (1963), and "Under the Boardwalk" (1964). All Drifters records were recorded pursuant to recording contracts negotiated and signed by The Drifters, Inc. and the Atlantic Recording Company. The majority of royalties were paid to The Drifters, Inc. and its shareholders. It was undisputed that Mr. Treadwell exercised exclusive managerial control over the group, without interruption, from 1954 until his death in 1967.

After Mr. Treadwell's death, his widow Faye succeeded him as The Drifters' principal manager and shareholder. Charlie Thomas left The Drifters shortly after Faye Treadwell assumed control, but the remaining group members, including John-

---

2. In 1959, The Drifters, Inc. amended its Certificate of Incorporation to make George Treadwell, Lewis Lebish, and Irving Nahan equal owners of The Drifters, Inc. Faye Treadwell inherited her husband's stock in 1967.

She later purchased Nahan and Lebish's shares and, in or about 1970, Faye Treadwell became the sole shareholder of The Drifters, Inc.

ny Moore, continued to sing and perform under the management of Mrs. Treadwell and as employees of The Drifters, Inc.[3]

It appears that the demand for live Drifters performances had substantially declined by the late 1960s. Although the Drifters shareholders continued to receive royalties from the sale of previously recorded albums, the Drifters' style of music had fallen out of favor in the United States. Treadwell began to focus the group's touring efforts in Europe, where The Drifters' popularity was growing.

## II. The Reunited Drifters: 1970 through 1995

In 1969, CBS Radio Network adopted an "oldies format" for their FM radio station. At about the same time, CBS also formed a partnership with Rock Magazine, a subsidiary company, to produce live concerts featuring reunited singing groups from the fifties and sixties. Larry Marshak was an editor at Rock Magazine at the time. Although he had never met George or Faye Treadwell or any of their singers, Marshak was given the task of reuniting some of the old groups, including The Drifters.

Marshak first called former-Drifter Ben E. King. King declined Marshak's invitation to participate in a Drifters reunion tour, but he suggested that Marshak contact Charlie Thomas. Charlie Thomas accepted the offer, as did Elsbeary Hobbs and Dock Green. They began performing under the name "The Drifters" in 1970, and then appeared regularly at concerts promoted by CBS Radio and Rock Magazine.[4] Shortly thereafter, Treadwell's attorney sent a letter informing Marshak that, pursuant to employment contracts signed by Thomas, Hobbs, and Green, Treadwell and The Drifters, Inc. owned the rights to the group's name.

In 1971, Treadwell brought an infringement action in the Supreme Court of New York against Marshak, Thomas, Hobbs, and Green, seeking to enjoin them from using the name "The Drifters" in connection with their performances. The court denied Treadwell's application for a preliminary injunction based upon its finding that Treadwell had not established a likelihood of success on the merits. The suit was dismissed the following year as a result of Treadwell's failure to provide adequate discovery.

Shortly after the dismissal of Treadwell's lawsuit in 1972, Marshak signed an exclusive management contract with his Drifters singers. Marshak's group toured extensively, and according to Marshak's testimony, he employed an aggressive litigation strategy to prevent any other groups from performing as "The Drifters." During this time, Treadwell became either unwilling or unable to compete with Marshak's superior resources. Since 1972, Treadwell's Drifters have performed primarily in Europe.[5]

Marshak testified that he later learned that a federal trademark registration would likely simplify his litigation strategy. After discussing the idea with Thomas, Hobbs, and Green, Marshak hired a trademark lawyer to draft the necessary documents. On December 15, 1976, Thomas, Hobbs, and Green executed an assignment of all of their rights to The Drifters mark to Larry Marshak.[6] Two days later, on

---

**3.** Johnny Moore first joined The Drifters in 1954. He then served in the United States Army from 1957 to 1963. After leaving the Army, Moore rejoined The Drifters and signed an employment contract in 1963. He sang lead vocals on many original Drifters recordings, including "Under the Boardwalk" and "Saturday Night at the Movies" in 1964.

**4.** Following their respective departures from the original Drifters, neither Thomas, Hobbs, nor Green had performed as "Drifters" until they were reunited by Marshak in 1970.

**5.** According to Mrs. Treadwell's testimony, she had brought her group to England because of the demand for Drifters concerts that existed there, and also to avoid costly litigation with Mr. Marshak.

**6.** It appears that Marshak's consideration for the assignment was his promise to continue to employ and manage his assignors as Drifters singers in a fair and reasonable manner.

December 17, 1976, Thomas, Hobbs, and Green, acting through a partnership, filed an application in the United States Patent & Trademark Office to register "The Drifters" as a service mark for use in connection with a musical group. In support of their application, the registrants signed a declaration certifying that: (1) they believed themselves to be the rightful owners of "The Drifters" mark, and (2) to the best of their knowledge and belief, no other person or company had the right to use "The Drifters" mark in commerce.

On January 3, 1978, The Patent & Trademark Office issued a service mark, Registration Number 1,081,338, for "The Drifters." Marshak has owned that federal registration since 1978, and it has achieved incontestible status under the Lanham Trademark Act.

Marshak subsequently expanded his operation to include two, and sometimes three, separate groups of Drifters. Marshak testified that he coordinated his groups' performances so that there would never be more than one Drifters group in a particular geographic area. There was also evidence that Marshak signed a recording contract with Musicor Records and that some of his singers recorded new songs under the name "The Drifters," although Marshak testified that none of these recordings ever achieved the "Top Ten" status enjoyed by the original Drifters songs.

At the conclusion of the trial in this case, the jury found that Marshak and his assignors had never owned any rights to the name "The Drifters," and that they had defrauded the Patent and Trademark Office into issuing a federal trademark registration. Although the jury found that Marshak later acquired common law rights in the Drifters mark, he has lost the benefits of his incontestible federal registration. The jury's verdict leaves Treadwell in essentially the same position from which she started. Both parties now move before this Court for relief from the jury's verdict.

## DISCUSSION

### I. Standards of Review

■ Federal Rule of Civil Procedure 50 directs trial courts to enter judgment as a matter of law when "there is no legally sufficient evidentiary basis for a reasonable jury to find" in favor of the non-moving party on an essential issue. In deciding a renewed motion for judgment as a matter of law, the Court must grant all reasonable inferences in favor of the jury's verdict. *See Barna v. City of Perth Amboy,* 42 F.3d 809, 812 (3d Cir.1994). This Court may not consider either the credibility or weight of the evidence. *See Motter v. Everest & Jennings, Inc.,* 883 F.2d 1223, 1228–29 (3d Cir.1989). Rather, this Court must "confine [itself] to ascertaining whether the party against whom the motion is made adduced sufficient evidence to create a jury issue." *Id.* at 1229 (quoting *Fireman's Fund Ins. Co. v. Videfreeze Corp.,* 540 F.2d 1171, 1178 (3d Cir. 1976), *cert. denied,* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977)).

■ Motions for a new trial are governed by the less exacting standards embodied in Rule 59. Under this Rule, a court may, in an exercise of its discretion, grant a new trial if the jury's verdict is against the clear weight of the evidence or if substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions. *See Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251, 61 S.Ct. 189, 85 L.Ed. 147 (1940); *see also* 12 MOORE'S FEDERAL PRACTICE § 59.13[1]. However, errors committed during the course of a trial cannot justify the grant of a new trial unless they affected the substantial rights of the parties. *See* Fed.R.Civ.P. 61.

■ A Rule 59 motion may also be granted upon a finding that the jury's verdict was against the great weight of the evidence. However, the Third Circuit has instructed that trial courts have an "obligation to uphold the jury's [verdict] if there exists a reasonable basis to do so."

*Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir.1989). Therefore, this Court must "search the record for any evidence which could have led the jury to reach its verdict, 'drawing all reasonable inferences in favor of the verdict winner.'" *Nissim v. McNeil Consumer Prod. Co., Inc.*, 957 F.Supp. 600, 601 (E.D.Pa.1997)(quoting *Blum v. Witco Chemical Corp.*, 829 F.2d 367, 372 (3d Cir.1987)); *see also* 12 MOORE'S FEDERAL PRACTICE § 59.13[2][a].

## II. Plaintiff Marshak's Motions

### A. Renewed Motion for Judgment as a Matter of Law

#### 1. Sufficiency of Evidence

■ The Lanham Act requires every trademark applicant to sign an oath declaring that the applicant believes himself to be the owner of the mark sought to be registered and "that no other person, firm, corporation, or association, to the best of [the applicant's] knowledge and belief, has the right to use such mark in commerce." 15 U.S.C. § 1051(a)(1)(A). Fraud in procuring a trademark "occurs when an applicant knowingly makes false, material representations of fact in connection with an application." *Metro Traffic Control, Inc. v. Shadow Network Inc.*, 104 F.3d 336, 340 (Fed.Cir.1997)(citing 15 U.S.C. § 1064(3)).

Fraud also occurs when an applicant willfully fails to correct an originally innocent misrepresentation after learning the true facts, knowing that the Patent & Trademark Office ("PTO") relied upon the misrepresented facts in granting the registration.

■ There has been no dispute that Marshak stands in the shoes of his assignors and that Marshak can have no greater trademark rights than they had. *See Hyosung America, Inc. v. Sumagh Textile Co.*, 934 F.Supp. 570, 576–77 (S.D.N.Y.1996), *aff'd in part, reversed in part*, 137 F.3d 75 (2d Cir.1998). Nor has there been any dispute that the assignors—Thomas, Hobbs, and Green—acted through a partnership when they filed their federal trademark application. *See* Trans. at 144; *see also* Pretrial Order, Stip. Fact No. 25. Therefore, fraud may be established by evidence that either Charlie Thomas, Elsbeary Hobbs, or Dock Green knowingly made material misrepresentations in connection with their trademark application.[7]

■ In this case, the jury concluded that Marshak's federal trademark registration had been obtained by a fraud on the Patent and Trademark Office. He now asks this Court to set aside the jury's verdict on the ground that no reasonable

7. Mr. Marshak's knowledge that the trademark application contained material misrepresentations was also relevant, in addition to his assignors' knowledge, because Marshak plainly testified that he was more than a purchaser or assignee of the trademark registration; he conceived, coordinated, and executed the entire plan.

Marshak testified that he got the idea of filing a trademark registration from an article he had read about the group "The Platters" and how they had been able to protect their name by obtaining a trademark. *See* Trans. at 712. Marshak said that he "thought maybe this would be a way for us to simplify the litigation process." *Id.* Marshak further testified that he discussed the idea with Charlie Thomas, Doc Green, and Elsbeary Hobbs. *See id.* at 711–14. Marshak then discussed the matter with his personal attorney, and he subsequently retained a lawyer who specialized in trademark law. *See id.* After several

subsequent meetings with the trademark attorney, Marshak, Thomas, Hobbs, and Green agreed to pursue the federal registration. *See id.* at 140 ("we came to the conclusion we would file for trademark"). Marshak also testified that he was present while the trademark documents were drafted. *See id.* at 144. Finally, it is a stipulated fact in this case that Thomas, Hobbs, and Green executed the assignment to Marshak two days before they filed the trademark application. *See* Pretrial Order, Stip. Fact Nos. 27–29.

To the extent that Marshak and his assignors acted in concert and pursuant to an agreement to defraud the Patent and Trademark Office, the jury was free to impute Marshak's knowledge to his assignors. Marshak's knowledge was also relevant to the extent that he wilfully failed to correct material misrepresentations during the 23 years following the initial application and assignment.

jury could have found that the trademark registrants acted with fraudulent intent.[8]

After reviewing the evidentiary record, this Court is unable to see the merit in Marshak's motion. In this Court's judgment, the evidence of fraud was overwhelming.

### Charlie Thomas' Employment Contract

First, there was the written employment agreement executed by Charlie Thomas and The Drifters, Inc.[9] *See* Trial Exh. D–19. By its terms, the contract was executed during April of 1960 "between THE DRIFTERS, INC., a New York corporation, hereinafter called the 'EMPLOYER' and CHARLES THOMAS . . . hereinafter the 'ARTIST.'" The contract contains numerous clauses regarding Thomas' obligations to perform and record songs at the sole direction of his employer, The Drifters Inc., and also forbidding Thomas from making any musical recordings without the express written consent his employer. What was most decisive in this case, however, was paragraph seven of the agreement, which provides:

> The Artist agrees that the name of THE DRIFTERS belongs exclusively to the Employer and that he will not at any time use the name of The Drifters or any name similar thereto or any name incorporating The Drifters. In the event the employee leaves the employ of The Drifters he will not in any way advertise or attempt to publicize the fact that he had been a member of a singing group known as The Drifters and will not associate his name in any manner with The Drifters; and he further acknowledges that the name, The Drifters,

is a valuable property and any violation of this paragraph could not be adequately compensated by money damages and he therefore agrees that the Employer shall be entitled to an injunction in any Court of competent jurisdiction to enjoin any violation or threatened violation of this contract by the Artist.

*Id.; see* Trans. at 440–56.

Thomas' employment contract, standing alone, was sufficient for the jury to conclude that Thomas had made a knowing and material misrepresentation in his trademark application.

### Continuous Commercial Use of Original Drifters Recordings

Next, the jury heard uncontroverted testimony regarding the continuous commercial use of original Drifters recordings, which have been played on the radio and sold in record stores since the 1950s. *See* Trans. at 597. Moreover, the following stipulated facts were read into evidence:

13. Treadwell's Drifters performed and recorded a number of songs throughout the United States under the name The Drifters, each of which are original works of authorship.

14. Amongst the most popular of these songs are "There Goes My Baby," "Up on the Roof," "Under the Boardwalk," "Save the Last Dance for Me," and "On Broadway," each of which were "Top–10" hits on Billboard's Rhythm and Blues charts.

15. Each of these songs have [been] publicly performed on the radio throughout the United States, sold on singles records and albums, and continue to be played and sold in the United States to this day.[10]

---

**8.** Marshak does not argue that the representations made to the PTO were true or immaterial.

**9.** At trial, Marshak objected to the admission into evidence of photocopies of the Thomas contract, but he never disputed the fact that Thomas had signed an employment contract with The Drifters, Inc. Indeed, it was a stipulated fact that "Dock Green, Elsbeary Hobbs and Charles Thomas each signed employment contracts with The Drifters, Inc." Pretrial Order, Stip. Fact No. 9. Marshak's evidentiary

objection is discussed in connection with his motion for a new trial, *infra.*

As to Marshak's claim that there was confusion between Charlie Thomas' employment contract (Trial Exh. D–19) and a different contract signed by singer Charles "Don" Thomas (Trial Exh. P–QQQ), the jury was able to examine and compare both contracts.

**10.** These stipulations were reaffirmed by Mr. Marshak during his cross-examination. *See* Trans. at 274–75; *see also id.* at 68–70. The evidence showed that the famous Drifters

Trans. at 274–75; *see also* Pretrial Order at 5; *Marshak v. Green,* 505 F.Supp. at 1060 ("Drifters' records have been continuously available").

In sum, Marshak and his assignors applied for a trademark that was already being used in connection with the original Drifters records. Those records have been continuously marketed and sold under the name "The Drifters" and they contain the same songs that Marshak's group sings at its performances. In this Court's judgment, the applicants' failure to disclose this fact to the PTO is strong evidence of fraudulent registration and it was wholly uncontroverted at trial. There was simply no suggestion in this case that Thomas, Hobbs, Green, or Marshak were unaware, at the time of their trademark application, that Atlantic's recordings of original Drifters songs were being marketed, sold, and played on the radio throughout the United States. The jury was therefore free to conclude that they knew.

Atlantic Records' continuous commercial use of the original Drifters recordings provided clear and convincing evidence that Thomas, Hobbs, and Green committed a fraud upon the Patent and Trademark Office when they certified in 1976 that no other person, firm, corporation or association had the right to use The Drifters trademark in commerce. *See Metro Traffic Control, Inc. v. Shadow Network Inc.,* 104 F.3d 336, 340 (Fed.Cir.1997)(holding that third party may petition to cancel fraudulently obtained trademark registration).

---

songs listed in Stipulated Fact 14 were recorded pursuant to recording contracts between The Drifters, Inc. and Atlantic Records. *See* Trans. at 413, 419–20.

It is worth repeating that Marshak testified that he had no connection with The Drifters when they recorded any of the Top Ten songs for which the group became famous; indeed, Marshak stated that he was in high school at the time. *See* Trans. at 274–82. Marshak's Drifters have not recorded any original Top Ten songs while under his management.

11. Marshak argues that it was error for this Court to permit Thomas' *Arista* deposition to

## Charlie Thomas' Depositions

The jury also heard deposition testimony given by Charlie Thomas in two prior lawsuits, *Marshak v. Arista Records,* Civ. Index No. 96–3032(JBW)(S.D.N.Y.), and *Marshak v. Green,* Civ. Index No. 79–3458(EW)(S.D.N.Y.). Portions of these depositions were read into the record during Marshak's cross-examination in this case. *See* Trans. at 347–51, 388–94.[11]

In the *Arista* deposition, Thomas testified that he had joined The Drifters during the late 1950s at the request of George Treadwell. *See id.* at 347. Thomas also testified that Treadwell was the manager of the group and that Treadwell made all final decisions relating to performances, costumes, appearance bookings, musical content, travel arrangements, and personnel changes.[12] *See id.* at 347–51, 389; *see also Rick v. Buchansky,* 609 F.Supp. 1522 (S.D.N.Y.1985)(holding that, in the absence of written contracts, the manager of a singing group may own the rights to the name if he or she remains continuously involved with the group and is in a position to control the quality of its services). Thomas further stated that he considered himself an "employee" of The Drifters and that he signed an employment contract to that effect. *See id.* at 348. He also stated that he was compensated in the form of a weekly salary. *See id.* at 389. Finally, Thomas testified that George Treadwell owned the rights to the name "The Drifters." *See id.* at 348.

In the *Green* case, Thomas testified that, after George Treadwell's death in 1967, he

---

be read into the record—notwithstanding his failure to make a timely objection. This issue is discussed below, in connection with Marshak's motion for a new trial pursuant to Rule 59.

12. Faye Treadwell and Ruth Bowen, a booking agent, also testified that George Treadwell made all final decisions regarding the group's performances and personnel. *See* Trans. at 400–07 (Ruth Bowen), Trans. at 463 (Faye Treadwell).

continued to sing as a member of The Drifters under the management of Faye Treadwell. *See* Trans. at 393. He also stated that Mrs. Treadwell made all final decisions affecting the group. *See id.* Finally, Thomas testified that he later quit Treadwell's Drifters and pursued a solo career singing under his own name, "Charlie Thomas." *See id.* at 390–91.[13]

Marshak offered no evidence to rebut Thomas' admission that he did not own the name "The Drifters" when he applied for his trademark registration. The Thomas depositions therefore provided sufficient evidence to support the jury's verdict.

**Johnny Moore's Testimony**

Johnny Moore sang lead vocal on the original Drifters recording of "Under the Boardwalk" in 1963 and "Saturday Night at the Movies" in 1964. *See* Trans. at 605. He testified that he joined George Treadwell's Drifters in 1954 and that he stayed with the group until he was drafted into the Army in 1957. *See id.* at 602. When Moore returned to the group in 1963, he was required to sign an employment contract with The Drifters, Inc. *See id.* at 606–07. Moore testified that he worked for George Treadwell's Drifters until Mr. Treadwell died in 1967. *See id.* at 608. Moore also testified that, when Mrs. Treadwell succeeded her husband as the group's manager in 1967, both Moore and Charlie Thomas continued to perform as members of The Drifters under Mrs. Treadwell's management. *See id.* Thomas quit the group within a year of Mr. Treadwell's death; Moore stayed until 1979. *See id.* at 603, 608–09.

**Larry Marshak's Testimony**

In addition to Charlie Thomas' employment contract and deposition testimony, as well as evidence regarding the continuous

commercial use of original Drifters recordings, the jury also heard Mr. Marshak's live testimony and two of his prior depositions.

In the *Green* case, Marshak admitted that he knew that Thomas, Hobbs, and Green had previously been managed by Faye Treadwell.[14] Mr. Marshak was then asked, "If someone had been with George Treadwell's Drifters and been part of the Drifters, would he have had the right to use the name Drifters?" Trans. at 387–88. Marshak answered:

> In the music business, continually there are people coming and going in groups.... The only person who has the right to the name is the person that develops it and keeps it in the public's eye. I might be one person, but the whole act, it is a continuing situation. People die and new people is a hundred people. That's what it looks like. I don't know what that means. Continually four or five of them are changing every day and it's a common—*certainly someone who sang with the Drifters, just by virtue of having sung with the Drifters, didn't develop a right to the name when he left voluntarily or even when he was dismissed from the Drifters.*

Trans. at 388 (emphasis added); *see also* Trans. at 235–43, 711; *Rick v. Buchansky*, 609 F.Supp. 1522 (S.D.N.Y.1985).

Marshak's live testimony was also telling. In describing how he came to manage his Drifters group, Marshak told the jury that the first ex-Drifter he solicited regarding the 1970 reunion was Ben E. King, who declined the offer. *See* Trans. at 90–92. Marshak also testified that, shortly after he had reunited Thomas,

---

**13.** All of the evidence at trial, in addition to the stipulated facts, established that Charlie Thomas performed as a member of Treadwell's Drifters until at least the end of 1967, after Faye Treadwell had succeeded her husband as the group's manager. *See* Pretrial Order, Stip. Fact No. 11; *see also* Trans. at 608–09.

**14.** When asked if he knew a person named Abdul Samad, Mr. Marshak answered that "he [Samad] arranged music for Charlie, Doc and Barry [Hobbs] *when they were with Faye.* I don't know who it was for." Trans. at 387 (emphasis added). Indeed, it is a stipulated fact in this case that "Charles Thomas was a singer with Treadwell's Drifters from 1959 to 1967." Pretrial Order, Stip. Fact No. 11.

Hobbs, and Green in 1970, he received a letter from Mrs. Treadwell's attorney claiming that The Drifters Inc. had superior rights to the name of the group. *See* Trans. at 96–98. Marshak also admitted that, several years prior to his federal trademark application, he had seen copies of the employment contracts between The Drifters Inc. and Marshak's assignors. *See id.* at 98–102, 104, 108, 288. Finally, Marshak testified that it had been his idea to file the trademark application in 1976, and that he handled all of the necessary details. *See* Trans. at 711–14; *see also* footnote 1, *supra*.

In addition to Marshak's sworn testimony, the jury also watched a video-tape of a television interview in which Marshak gave the following description of Charlie Thomas' connection with the original Drifters:

They already had had three top ten records by the time [Charlie Thomas] joined the Drifters in the 1950's. He joined the Drifters as an employee. He got a job. He was now a sideman.

Can a sideman in *Les Mis* go around saying he is *Les Mis?* Of course not. He got a job. He worked then under somebody's direction, who told him what to do. . . .

None of the original members, not from the Drifters, the Platters, the Marvelettes, ever wrote those songs, ever arranged those songs, ever chose the materials, chose the singers to perform. They had nothing to do with what made them hit records, except their voices.

Stipulated Transcription of Video Tape (Trial Exh. D–100), attached as Exhibit A to June 21, 1999 Stipulation; *see* Trial Trans. at 256–65.

In the end, Marshak offered no explanation for how Thomas, Hobbs, and Green alone possessed the exclusive rights to the name "The Drifters" in 1976; nor did Marshak testify that he subjectively believed that they possessed such rights.[15] Indeed, all of the evidence on this point was unequivocal: Marshak knowingly and intentionally helped his assignors defraud the Patent & Trademark Office into issuing a registration for a name that none of them owned.

## Alleged Bases for J.N.O.V.

In this Court's judgment, the foregoing evidence provides ample support for the jury's finding that Marshak's federal trademark registration had been fraudulently obtained. Nevertheless, Marshak contends that no reasonable jury could have found fraud in light of the following three facts: (1) Marshak relied on the fact that Treadwell's 1971 lawsuit against him had been dismissed; (2) Marshak and his assignors consulted with a trademark at-

---

15. The only evidence that even remotely touched on this issue was a remark in Mrs. Treadwell's 1993 book:

Following the departure of Gerhart Thrasher and company in May 1958, Treadwell transferred the name Drifters to a group previously called the Crowns. When George died in 1967, all rights to the Drifters name passed to his widow Faye . . . .

Tony Allan with Faye Treadwell, *Save the Last Dance for Me: The Musical Legacy of the Drifters, 1953–1993*, at 123 (Popular Culture, Ink.1993)(Trial Exh. D–58); *see also* Trans. at 496–98.

Obviously, the foregoing passage is not substantive evidence of a 1958 transfer of trademark rights. *See* Trans. at 777–79. The quoted passage does not suggest or imply that The Crowns or its members ever received any legal rights in the name "The Drifters." This was confirmed by the evidence at trial, which established that George Treadwell, who had become dissatisfied with his Drifters singers, asked Lover Patterson to "sign[] over the contracts of the [] Crowns to George Treadwell." *Save the Last Dance for Me*, at 79; *see id.* at 71 (Treadwell decided "to replace the Drifters with the Crowns"). Finally, it was stipulated in this case that:

The members of Treadwell's Drifters varied over the years. Three of these replacement singers, Dock Green, Elsbeary Hobbs, and Charles Thomas, were from a group previously performing as "The Crowns."

Pretrial Order, Stip. Fact Nos. 7–8.

This Court finds that the book's reference to a "transfer to the Crowns" was insufficient to create an issue of fact for the jury. Marshak presented no substantive evidence that George Treadwell or The Drifters, Inc. had ever sold, assigned, or otherwise transferred any trademark rights to Hobbs, Green, Thomas, Marshak, or The Crowns.

torney prior to submitting their federal trademark application; and (3) even if the application failed to disclose other users of the mark, such omissions were not fraudulent because Marshak and his assignors reasonably believed that those users were trademark infringers rather than trademark owners.[16]

Turning first to the 1971 lawsuit, this was an action brought by The Drifters Inc. against Marshak and his assignors in the Supreme Court of New York. *See The Drifters, Inc. v. Thomas, et al.,* Index No. 27336/1971; Trial Exh. D–B. In that case, the court denied Treadwell's application for a preliminary injunction, and later dismissed the complaint because of Treadwell's failure to provide discovery. Marshak contends that he and his assignors reasonably believed, on the basis of this dismissal, that Treadwell had no rights in the name "The Drifters." [17]

Of course, any claim of reasonable reliance first requires proof of actual reliance. In this case, Marshak has cited no testimony or other evidence that he or his assignors subjectively believed that the dismissal of Treadwell's 1971 lawsuit constituted a final adjudication of their trademark rights. But even assuming that there was evidence of reliance, the jury clearly rejected it as unreasonable.

The jury also rejected Marshak's claim that he and his assignors had relied on the advice of a trademark attorney when they applied for their federal registration. There was simply no testimony that Marshak or his assignors discussed with the attorney either The Drifters Inc. employment contracts or Atlantic Records' continuous commercial sale of original Drifters recordings. Moreover, the evidence of the registrants' knowing misrepresentations was legion in this case. The jury surely could conclude that any claim of reliance was insincere or unreasonable.

Finally, the jury rejected Marshak's suggestion that the registrants' failure to disclose other users of the mark could not have been fraudulent because they had a colorable claim that those other users were infringers. The jury properly rejected this argument because there was no evidence that the registrants had a colorable claim of infringement against both Treadwell's Drifters and Atlantic Records prior to the 1976 trademark registration.[18] Moreover, there was no testimony that Marshak or his assignors subjectively believed that both Treadwell and Atlantic Records were infringers. In the absence of such testimony, there is simply no factual basis for Marshak's argument.

**16.** Marshak also argues that the jury "should have accepted" the expert testimony given by Jeffrey Samuels. Pl. Mem. In Support at 19. However, Mr. Samuels merely testified generally about the PTO's application procedures. Although Mr. Samuels also stated that Marshak and his assignors had complied with the PTO's filing procedures, he did not express an opinion about whether the application contained any fraudulent misrepresentations. His testimony may have provided background information that was helpful to the jury, but it was not substantive evidence.

**17.** Under New York law, a dismissal for failure to comply with discovery obligations is not a judgment on the merits and does not bar a subsequent suit involving the same parties and issues. *See Maitland v. Trojan Electric & Machine Co., Inc.,* 65 N.Y.2d 614, 491 N.Y.S.2d 147, 480 N.E.2d 736 (1985); *see also* 7B N.Y. C.P.L.R. (McKinney's) § 5013

("a judgment dismissing a cause of action before the close of the proponent's evidence is not a dismissal on the merits unless it specifies otherwise").

The jury was instructed to consider the 1971 New York decision only as it related to the registrants' knowledge or belief that no other person had legal rights to use the name "The Drifters" in commerce. It was not admitted as substantive evidence of trademark rights. *See* Trans. of Proc. at 720–21.

**18.** Marshak's counsel does not state a factual basis for this defense, but presumably he is referring to the 1971 New York case. However, Thomas, Hobbs, and Green were *defendants* in that case, which was later dismissed because of the plaintiff's failure to answer interrogatories. Such a dismissal could not, by itself, confer upon the registrants a colorable claim of infringement.

In the end, there was more than sufficient evidence to support the jury's verdict that Marshak's trademark registration had been fraudulently obtained. Indeed all of the evidence led to the same conclusion: Thomas, Hobbs, Green, and Marshak knowingly and unabashedly took possession of a valuable trademark to which they had no colorable claim and then sought to register that mark with the PTO. The evidence also showed that they knew, but failed to disclose, that Atlantic Records was using the mark in connection with its marketing and sale of original Drifters records. Indeed, Marshak never really disputed that the 1976 trademark application contained these two material misrepresentations, and he utterly failed to adduce any evidence in support of his claim that these misrepresentations were innocent rather than fraudulent.[19] In this Court's view, the jury's verdict reflected the only reasonable conclusion supported by the evidence; there was fraud as a matter of law.

### 2. Legal and Equitable Bases for J.N.O.V.

### a) Res Judicata and Related Doctrines

■ Marshak has always contended in this case that Treadwell's counterclaim for cancellation is precluded by prior litigations. This Court has repeatedly rejected this argument because Marshak has cited only one prior case in which Treadwell was a party-in-interest, *The Drifters, Inc. v. Thomas, et al.*, Index No. 27336/1971 (N.Y.Sup.Ct.), which was dismissed because of Treadwell's failure to provide adequate discovery. *See* Trans. at 435–38. No issue was actually litigated in that case and there was no judgment on the merits. *See Maitland v. Trojan Electric & Machine Co., Inc.*, 65 N.Y.2d 614, 491

N.Y.S.2d 147, 480 N.E.2d 736 (1985)(holding that, under New York law, a dismissal for failure to comply with discovery obligations is not a judgment on the merits and does not bar a subsequent suit involving the same parties and issues); *see also* 7B N.Y. C.P.L.R. (McKinney's) § 5013 ("a judgment dismissing a cause of action before the close of the proponent's evidence is not a dismissal on the merits unless it specifies otherwise").

■ Treadwell was not a party-in-interest in any of Marshak's other lawsuits and she is therefore not bound by them. Indeed, in the two published opinions relied upon by Marshak, both district judges expressly declined to consider whether Marshak and his assignors had defrauded the PTO when they failed to disclose Treadwell's superior rights in their trademark application:

> These arguments miss the mark, however, because they could only accrue, if at all, to Treadwell's benefit, not to Sheppard's. Sheppard argues that the rights to "The Drifters" were lodged in the group's manager, Treadwell, and the corporation he set up to control the group's assets. In this case, however, when only Marshak's and Sheppard's rights are at stake, these arguments are irrelevant.

*Marshak v. Sheppard*, 666 F.Supp. 590, 598–600 (S.D.N.Y.1987); *see also Marshak v. Green*, 505 F.Supp. 1054, 1060–61 (S.D.N.Y.1981)(holding that Dock Green was estopped from asserting a claim of fraudulent registration because "Green swore to and signed the application").[20]

■ For these same reasons, this Court rejects Marshak's related contention that "the rule of *stare decisis* requires that a prior finding that Larry Marshak's mark

---

**19.** Even assuming, *arguendo,* that the misrepresentations were innocent when made in 1976, Marshak's failure to correct these material falsehoods during the subsequent 23 years also requires a finding of fraud.

**20.** Notwithstanding Marshak's objection, this Court finds no error in its refusal to publish the *Green* and *Sheppard* decisions to the jury. These materials were irrelevant under Rule 401. In addition, any probative value was substantially outweighed by the danger of unfair prejudice. *See* Fed.R.Evid. 403.

is valid compels a finding of validity in the second action." Plaintiff's Memorandum in Support of Post–Trial Motions at 52–53. Treadwell's claim of fraud had not been previously litigated; she was entitled to her day in court.

This Court also rejects Marshak's assertion that Treadwell should be judicially estopped from claiming rights in the name "The Drifters" based upon her recent settlement of a royalty dispute in *Thomas v. The Drifters, Inc.*, Index No. 25930/92 (N.Y. Sup.Ct., Queens Cty.). This Court has examined the transcript of that settlement; it reflects nothing more than Treadwell's agreement to make certain royalty payments to former members of The Drifters. She did not, as Marshak argues, disavow any rights or claims to the name "The Drifters." Indeed, the transcript contains no factual findings or representations of any kind. *See* Transcript of Proceedings, Jan. 6, 1999, attached as Exhibit E to Supp. Cert. of Mark J. Ingber in Further Support of Plaintiff's Post–Trial Motions.

#### b) Statute of Limitations

■ Marshak next argues that Treadwell's counterclaim for cancellation is barred by New York and New Jersey's six-year statute of limitations. However, Marshak simply cites no authority in support of his claim that this Court must borrow a state-law limitations period. Treadwell's counterclaim was brought pursuant to 15 U.S.C. § 1064(3), which, by its terms, permits such an action to be brought "at any time."

#### c) Subject Matter Jurisdiction

Marshak next contends that a petition to cancel a fraudulently procured trademark registration pursuant to 15 U.S.C. § 1064 may not be litigated in a federal district court. Although Marshak has never before raised this issue, this Court has considered the objection and finds it to be without merit.

■ Marshak cites no case in support of this argument. To the contrary, the cases Marshak has most heavily relied upon in this litigation show that "in general, neither opposition to registration nor a petition for cancellation under 15 U.S.C., section 1064, is a prerequisite to a cancellation counterclaim in an infringement action." *Marshak v. Green*, 505 F.Supp. at 1060; *see also Orient Express Trading Company, Ltd. v. Federated Department Stores, Inc.*, 842 F.2d 650 (2d Cir.1988).

#### d) Equitable Relief

■ In light of the overwhelming evidence of fraud presented in this case, the Court declines to exercise its equitable powers on Marshak's behalf. This Court therefore rejects Marshak's invocation of the doctrine of laches. *See Bausch & Lomb, Inc. v. Leupold & Stevens, Inc.*, 1 U.S.P.Q.2d 1497, 1499, 1986 WL 83320 (TTAB 1986)(holding that equitable defense of laches is inapplicable to claims of fraud).

The Court also declines to grant Marshak injunctive relief. First, the jury found that Treadwell did not infringe on Marshak's common law trademark rights; second, this Court will not consider alleged acts of infringement that occurred subsequent to the jury's verdict; and third, Mr. Marshak has unclean hands.

### B. Motion for New Trial

#### 1. Jury Instructions

Marshak contends that this Court's charge to the jury contained two legal errors that warrant a new trial. First, Marshak argues that it was error, in light of Marshak's incontestible trademark registration, to instruct the jury on the question of trademark ownership. Second, Marshak argues that it was error for this Court to instruct the jury that a verdict of fraudulent registration could be based upon a finding that the trademark registrants "knew or reasonably should have known" that their representations to the PTO were materially false.

### a) Ownership Instruction

■ There was no question in this case that Marshak had an incontestible trademark registration for the name "The Drifters" as used in connection with a singing group. An incontestible mark is conclusive evidence of the registrant's ownership and exclusive right to use the mark. *See* 15 U.S.C. § 1115(b). However, "[e]ven where the mark has become incontestible, the statute allows challenge to the trademark on the basis that 'the registration or the incontestible right to use the mark was obtained fraudulently.'" *Marshak v. Sheppard*, 666 F.Supp. 590, 598 (S.D.N.Y.1987)(quoting 15 U.S.C. § 1115(b)(1)).

In this case, Marshak initiated an infringement action against Treadwell. As a defense to that lawsuit, Treadwell alleged that the registrants of the trademark—Dock Green, Elsbeary Hobbs, and Charles Thomas—committed a fraud on the PTO when they misrepresented that they owned the rights to the name "The Drifters" and that "to the best their knowledge and belief no other person, firm, corporation or association has the right to use said mark ['The Drifters'] in commerce."

Accordingly, the Court gave the jury the following instructions:

> The defense of fraud will turn upon whether you believe that the persons who registered the mark knew or reasonably should have known that someone else had legal rights to the name "The Drifters." This will require you to consider the ways in which people acquire and lose legal rights in a name. You will have to determine who in fact owned the rights to the name "The Drifters" at the time Mr. Marshak's trademark was registered with the Patent and Trademark Office. And you will have to determine whether the persons who registered the mark made a fraudulent misrepresentation to the Patent and Trademark Office.

Trans. at 751–52 (emphasis added). Later in the charge, the jury received more detailed instructions regarding the incontestible status of plaintiff's trademark:

> Larry Marshak's registration for the service mark "The Drifters" has achieved incontestable status under the Lanham Trade Mark Act. The registration of an incontestable mark is conclusive evidence of the validity of the registered mark and of the registration of the mark, and of Larry Marshak's ownership of the mark, and of Larry Marshak's exclusive right to use the registered mark in commerce. Indeed, *incontestable status also protects a registrant from having his mark canceled by one merely claiming superior rights based on prior usage.*
>
> Since Larry Marshak's mark is federally registered and has achieved "incontestable" status, the first element necessary to prove trademark infringement, validity and legal protectability, is conclusively established. The second element, *Larry Marshak's ownership of his mark, is also admitted and conclusively established.*
>
> However, despite the term "incontestible," Marshak's incontestible mark may be canceled if defendants prove either that the federal registration was obtained fraudulently or that Marshak's registered mark is being used so as to misrepresent the source of the goods or services of Treadwell.

Trans. at 754–55 (emphasis added).

At the charge conference, counsel for Marshak insisted that the incontestible status of his mark should preclude any instruction regarding ownership of the rights to the name "The Drifters." Marshak's objection was misplaced, however, because this Court did not instruct the jury to decide Marshak's infringement suit on the basis of who owns or owned the mark. Indeed, the Court gave the jurors detailed instructions regarding Marshak's incontestible registration and its preclusionary effects. The Court also instructed the jury that fraud requires "clear and convincing evidence [of a] deliberate at-

tempt to mislead the Patent & Trademark Office into registering the mark." Trans. at 756.

However, in order to reach a verdict on Treadwell's defense of fraudulent registration, the jury had to determine whether the registrants knew it was false when they swore under oath that they owned the mark and that no other person had a right to use the mark in commerce. Without any instruction about how people can acquire or lose legal rights in a name, the jury would have had no standard by which to determine whether the registrants made a knowing misrepresentation to the PTO.

### b) Fraudulent Intent Instruction

■ Marshak next contends that this Court erroneously instructed the jury that they could find fraud based upon evidence that the registrants "knew or reasonably should have known" that their trademark application contained materially false statements. *See* Trans. at 634–35. The relevant portion of the charge stated:

When considering whether the servicemark Mr. Marshak possessed was obtained through fraud, the following factors must be proven by clear and convincing evidence:

1. a false representation was made to the Patent and Trademark Office regarding a material fact;

2. the registrant's knowledge or belief that the representation was false;

3. the intention to induce action or refraining from action in reliance on a misrepresentation;

4. reasonable reliance on the misrepresentation; and

5. damages proximately resulting from such reliance

The defendants, who allege such fraud, bear a heavy burden of proof. Fraud must be shown by clear and convincing evidence in order to provide a basis for either cancellation or damages and you may find fraud only when there is a deliberate attempt to mislead the Patent and Trademark Office into registering the mark.

Clear and convincing, as a standard of proof, requires a quantum of evidence somewhere beyond a mere preponderance, but well below that of 'beyond a reasonable doubt,' and such that it will produce in your mind as the trier of fact a firm belief as to the facts sought to be established. Honest mistake, inadvertence, erroneous conception of rights and negligent omission does not constitute fraud....

... [T]he applicant [has] a duty to disclose those users whom the applicant reasonably should know have legal rights to use the mark. In other words, if the applicant had a reasonable and good faith belief that no other person or entity had legal rights to use the mark, then the registration was not obtained by fraud.

Fraud against a registrant will not lie where a statement was a false misrepresentation occasioned by honest misunderstanding, inadvertence, negligent omission, or the like. Rather, fraud requires proof of a willful intent to deceive. However, fraud may be found if the applicant or registrant knew or reasonably should have known that the fact represented was not true.

A person may also commit fraud by willfully failing to correct his or her own originally innocent misrepresentation to the Patent and Trademark Office if that person later learns of the true facts, knowing that the Trademark Office has relied upon the misrepresented facts in granting the trademark registration.

If you merely find that Larry Marshak's assignors signed an application for trademark rights which stated that no others had the right to use The Drifters mark in commerce, this is insufficient to establish that Larry Marshak's assignors committed fraud in procurement of federal trademark, absent evidence that such assignors actually knew, or reason-

ably should have known that others had legal, contractual right to use mark.

Trans. at 755–58 (emphasis added).

Marshak's counsel objected to the "reasonably should have known" language on the basis of the Tenth Circuit's decision in *Stanfield v. Osborne Industries, Inc.*, 52 F.3d 867, 874 (10th Cir.1995). In that case, the plaintiff had granted to the defendant a "naked license" to use the name "Stanfield Products" and the defendant subsequently obtained a federal trademark registration for that name in 1978. *See* 52 F.3d at 872. Sixteen years later, the plaintiff-licensor sought to have the licensee's registration canceled because it was obtained by fraud in violation of 15 U.S.C. § 1120.

In affirming the district court's grant of summary judgment, the Tenth Circuit reasoned that the plaintiff had the burden of proving that the defendant had "signed the [trademark] oath knowing that it was false" and that, "therefore, [it is] the applicant's subjective belief that is at issue." 52 F.3d at 874. Significantly, however, the court did not suggest that this requires proof of actual knowledge.[21] Nor did the *Stanfield* court suggest that a sincere but unreasonable belief could defeat a claim of fraud. Indeed, when the Tenth Circuit turned to the facts presented in that case, the court stated only that the registrant "could have reasonably believed that plaintiff had waived his rights to the trademark in that [license] agreement." 52 F.3d at 874.

This Court is not persuaded that the Tenth Circuit's *Stanfield* decision, if adopted by the Third Circuit, would require an instruction materially different than the one actually given to the jury in this case.[22] Moreover, this Court found clearer guidance from the Federal Circuit, which has frequently confronted this issue.

In *Torres v. Cantine Torresella*, 808 F.2d 46 (Fed.Cir.1986), which involved an allegedly fraudulent trademark renewal application, the court stated that "[t]he problem of fraud arises because [the applicant] submitted a label that he *knew or should have known* was not in use that contained a mark clearly different from the one in use." 808 F.2d at 49. In affirming the PTO's decision to cancel the registration, the court held that "when [a registrant] *knows or should know* that he is not using the mark as registered ... he has *knowingly* attempted to mislead the PTO." *Id.; see also G.H. Mumm & Cie v. Desnoes & Geddes, Ltd.*, 917 F.2d 1292, 1296 (Fed.Cir.1990)(quoting *Torres*, 808 F.2d at 49).

In short, this Court has found no support for Marshak's proposed instruction that a sincere but unreasonable belief in a statement's truth defeats a claim of fraud. But even assuming that such an instruction was warranted, any error was harmless because there was no testimony or other evidence that Marshak or his assignors actually believed that their trademark application was truthful. Moreover, there was direct evidence that the registrants knew that their representations to the PTO were false.

First, Charlie Thomas testified in a prior deposition that he considered himself an employee of The Drifters Inc. and that George Treadwell owned the group and its name. Second, Thomas' employment con-

---

**21.** This is also consistent with the black letter rule, applicable in both civil and criminal cases, that knowledge may be established by proof of reckless disregard for the truth. *See United States v. Coyle*, 63 F.3d 1239, 1243 (3d Cir.1995)(holding that, in a criminal mail fraud prosecution under 18 U.S.C. § 1341, where "proof of specific intent is required, [it] may be found from a material misstatement of fact made with reckless disregard for truth").

**22.** Marshak also cites *Orient Express Trading Company, Ltd. v. Federated Department Stores, Inc.*, 842 F.2d 650, 653 (2d Cir.1988) for the proposition that "[t]he allegedly fraudulent statements may not be the product of mere error or inadvertence, but must indicate a deliberate attempt to mislead the PTO." This language is nearly identical to the instructions given to the jury in this case. *See* Trans. at 756, lines 5–17.

tract expressly stated that the name "The Drifters" belonged to his employer, The Drifters Inc. Finally, Larry Marshak stated, in a television interview, that Charlie Thomas had "joined the Drifters as an employee." Stipulated Transcription of Video Tape (Trial Exh. D–100), attached as Exhibit A to June 21, 1999 Stipulation; *see* Trial Trans. at 256–65.

There was also circumstantial evidence of knowledge. For example, every witness who testified about the original Drifters group, including Mr. Marshak, stated that the members of the original group changed frequently, and that no fewer than 30 different singers had performed and recorded original records under the management of George Treadwell and The Drifters, Inc. *See* Trans. at 711. It was also undisputed that Thomas, Hobbs, and Green were replacement singers hired by the Drifters in 1959—five years after George Treadwell started managing the group in 1954. *See* Pretrial Order, Stip. Fact Nos. 4, 6, 7–12, 18; *see also* Trans. at 601–08. Moreover, there was no dispute that The Drifters continued to perform and record hit records after Hobbs left the group in 1961, and after Green left in 1964.[23] *See id.* The evidence also showed that Johnny Moore joined Treadwell's Drifters in 1954 and that, after his military service, he worked for Treadwell's Drifters, without interruption, from 1963 until 1979. *See* Trans. at 602–03; *see also Robi v. Reed,* 173 F.3d 736 (9th Cir.1999)(holding that departed members of The Platters had no rights to the group's name because the original manager continued to use the name and manage the remaining Platters members). These facts support a reasonable inference that Marshak's assignors knew that they did not own the exclusive rights to the name "The Drifters" when

they filed their trademark application in 1976.

In response, Marshak produced no testimony that he or his assignors ever believed—reasonably or unreasonably—that they owned the exclusive rights to the name "The Drifters;" nor was there any evidence that they were unaware of the prior and continuous use of the mark in connection with the marketing and sale of original Drifters records.

In light of Marshak's utter failure to adduce any evidence, or even a plausible theory, to rebut Treadwell's overwhelming showing of fraud, any error in the Court's instructions to the jury was harmless. As a matter of law, the evidence permitted only one conclusion: Marshak's trademark registration was obtained by a fraud on the Patent & Trademark Office.

### 2. Objections to Evidence

### a) Charlie Thomas' Deposition in the *Arista* Case

Marshak contends that this Court erroneously admitted into evidence Charlie Thomas' deposition testimony from a prior lawsuit between Mr. Marshak and Arista Records. Marshak must first overcome the threshold issue of waiver, because his lawyer did not make a timely objection at trial. An objection is untimely, and thus waived, if it is not made as soon as the grounds for the objection could reasonably have been known. *See Gov't of Virgin Islands v. Archibald,* 987 F.2d 180, 184 (3d Cir.1993).

During Marshak's cross-examination, Mr. Flynn asked whether he knew that "Charlie Thomas was deposed in the Arista case." Trans. at 347. Marshak answered "yes," and also stated that he had been present during the deposition and represented by counsel.[24] *See id.* A

---

23. Significantly, the evidence showed that, following their respective departures from Treadwell's Drifters, neither Thomas, Hobbs, nor Green performed under the name "The Drifters" until they were hired by Larry Marshak during the early 1970s. *See* Trans. at 92–94, 390–91.

24. Marshak's lawyer at that time was Lowell Davis. Mr. Davis did not cross-examine Mr. Thomas because he had represented him in a prior lawsuit. *See* Trans. at 347

copy of the deposition was given to Mr. Marshak and his trial counsel, Mark Ingber, and then marked for identification. Mr. Ingber did not object. Mr. Flynn then asked Marshak 28 questions regarding the Thomas deposition. Mr. Ingber still made no objection. *See* Trans. at 347–51. Mr. Flynn then went on to cross-examine Marshak about a different subject, and shortly thereafter the Court took a recess. *See id.* at 351–52.

After the morning recess, Mr. Ingber made his first objection to the admission of Charlie Thomas' *Arista* deposition. This Court overruled the objection first on the basis of waiver. *See* Trans. at 359–61. Second, the Court also ruled that Thomas' deposition was admissible to show the state of mind of Thomas and Marshak. *See id.*

Mr. Ingber claims that his objection was timely because he had not had an opportunity to review the deposition transcript until it was introduced at trial. In this regard, Mr. Ingber made the following representation:

> I also want to note on the record that I was not the attorney at this Arista deposition. I had no idea about it. I was not familiar with any aspect of it ....

Trans. at 360. In addition, Mr. Ingber's post-trial certification states:

> I received [the Thomas deposition] *for the first time* [at trial]. Notwithstanding opposing counsel's false assertions that I had my own copy of the Thomas deposition transcript in advance of trial, I did not. Nor was I aware of its contents. Obviously, had I previously seen the unsworn [25] and incomplete Thomas

deposition transcript ... I would have immediately objected.

Supplemental Certification In Further Support of Plaintiff's Post–Trial Motions at ¶ 3 (emphasis in original).

As an initial matter, this Court finds that Marshak's claim of surprise was itself untimely.[26] However, this Court is more troubled by Mr. Ingber's admission that, during the discovery phase of this litigation, he had "objected to [Treadwell's request to produce the Thomas deposition] on the basis of relevance." Plaintiff's Reply Brief In Support of Plaintiff's Post–Trial Motions at 2. Indeed, in response to Treadwell's specific requests for production of the Larry Marshak and Charlie Thomas deposition transcripts from the *Arista* case, Mr. Ingber wrote:

> In response to your letter dated June 12th, I wish to reiterate that the information you are requesting is not relevant to any issue involved in the pending action nor is it reasonably calculated to lead to the discovery of admissible evidence. Accordingly, my client is not obligated to participate in your fishing expedition.

June 16, 1998 Letter of Mark J. Ingber, attached as Exhibit C to Supp. Cert. of Mark J. Ingber In Further Sup. of Post–Trial Motions; *see also id.* at Exhibit B (June 12, 1998 Letter of James P. Flynn).[27]

This Court will not comment further on Mr. Ingber's conduct. He has made representations to this Court that are patently inconsistent, and he is now precluded from claiming surprise. But even if Mr. Ingber's claim of surprise were timely and credible, it could not excuse his failure to

---

**25.** This Court is puzzled by Mr. Ingber's repeated references to the "unsworn" deposition of Charlie Thomas. The subject deposition transcript begins: "CHARLES THOMAS, the witness herein, having first been duly sworn by Tracey Vargas, a Notary Public in and for the State of New York, was examined and testified as follows ...." Feb. 27, 1998 Deposition of C. Thomas at 4, *Marshak v. Arista Records*, attached as Exhibit D to Supp. Cert. of James P. Flynn.

**26.** At oral argument, Mr. Ingber suggested that he had declined to object for tactical reasons:

> THE COURT: You didn't say: Your Honor, I object. I've been surprised. I never saw this document before.
>
> MR. INGBER: Because I wanted to hear it, your Honor.

Trans. of Proc., August 11, 1998, at 46.

**27.** Mr. Flynn and Mr. Ingber sent simultaneous copies of their letters to this Court.

make an objection that should have been obvious. *See Gov't of Virgin Islands v. Archibald,* 987 F.2d 180, 184 (3d Cir.1993). Charlie Thomas was neither a party nor a witness in the instant litigation and his deposition transcript from a prior lawsuit was therefore objectionable, on its face, as hearsay.

### b) Charlie Thomas' Deposition in the *Queens* Case

■■■ Marshak contends that this Court erroneously prevented him from cross-examining Mrs. Treadwell with a transcript of Charlie Thomas' deposition in *Thomas v. The Drifters, Inc.,* Index No. 25930/92 (N.Y. Sup.Ct., Queens Cty), which is a recently settled royalty dispute between Treadwell and several former Drifters singers. However, Marshak's brief contains no citation to an exhibit or other document that contains a transcript of the deposition he sought to use at trial. *See* Plaintiff's Memorandum of Law in Support of Post–Trial Motions at 30–32. In addition, this Court has scoured Marshak's voluminous submissions, in vain, to find a copy of the deposition transcript. This Court is therefore unable to evaluate the proffered testimony and must rely solely on the trial transcript, which reflects the following colloquy during Mr. Ingber's cross-examination of Mrs. Treadwell:

Q: Now, I'd like you to show you a deposition transcript of Charlie Thomas—

MR. FLYNN: Objection.

Q: —in connection with—

THE COURT: Show it.

Q: —with the case of Charlie Thomas and Elsbeary Hobbs against your company, The Drifters, Inc., and Atlantic Recording. I'd like to show that to you.

(Exhibit shown to the witness.)

THE COURT: What is the question?

MR. INGBER: Your Honor, this is—

THE COURT: What is the question.

MR. INGBER: I'd like you to turn to page 121.

THE COURT: What are you going to do?

MR. INGBER: Pardon?

THE COURT: What are you going to do?

MR. INGBER: Read.

THE COURT: Read her a portion of Charles Thomas' deposition?

MR. INGBER: Yes, your Honor.

THE COURT: Fine. I'll see you at sidebar.

.     .     .     .     .

(The following occurs at sidebar:)

MR. INGBER: Your Honor, this is the same deposition that both sides were reading earlier in the case, which I think came in—

THE COURT: Came in when you all were sleeping around.

MR. INGBER: We both agreed we could both use the deposition transcript without any different kind of objections.

MR. FLYNN: I beg to differ on that. First of all, the deposition testimony [I] confronted Mr. Marshak with was the Arista case. The only time this case, a case in New York, in the New York Supreme Court [w]as referred to, was when Ms. Treadwell was confronted on voir dire with her deposition. This is hearsay. The fact that Mr. Ingber didn't object when I used Thomas— there was no agreement. This can't come in. It is objectionable.

THE COURT: I don't know how it comes in evidence.

MR. INGBER: Your Honor, this is a statement against her interest, here.

THE COURT: By a person who is against her interest.

MR. INGBER: Not necessarily, your Honor. This is a case where she was involved in a lawsuit. She is a named party here. The Drifters, Inc. The other side is allowed to use Charlie Thomas' deposition testimony.

THE COURT: You are totally missing the point. First of all, the other testimony that was permitted, number one, went to two things. Number one, it

was—the horse was out of the box and you never objected to the testimony.

Secondly, that testimony went to the state of mind and the knowledge of your client, Mr. Marshak, at the time he filed this application for trademark registration. It went to the element of his knowledge and whether he was aware of certain things at that time. I permitted that because of those two factors.

To come in now to seek to use a deposition from someone who is—actually, a non-party—well, he's a party in one sense. But he's a non-party. Although Mr. Marshak's rights are derivative.

MR. INGBER: Exactly.

THE COURT: To suggest that his testimony in a prior proceeding can be used or admitted into evidence either to cross-examine this witness or on its own is absolutely wrong. I will not permit it. You have an exception.

MR. INGBER: I wasn't going to say that. I'd like to read it out on rebuttal.

THE COURT: You can't read it.

MR. INGBER: Why, your Honor? Based on my client's reliance. My client steps into his shoes, your Honor.

THE COURT: What theory is that? April 5th, 1995?

MR. INGBER: Right. She testified he's a liar already, your Honor.

THE COURT: That has nothing to do with the admission of a deposition of a non-party to this proceeding. These are sworn—what is his name? Mr. Thomas. Bring him in. Bring him in to testify.

MR. INGBER: You let them use it.

THE COURT: Don't say I let. You let, sir. Number one. You let it in. You never objected to it. Had you objected to it, I would have permitted it in anyway, dealing with the state of mind of the plaintiff, Mr. Marshak, who against him the defense has raised there was a fraud committed on the Trademark Office.

His state of mind becomes very important with the jury assessing whether or not this defendant can prove, as they have the obligation to prove and they have the burden of proving, fraud. That is a different subject matter.

MR. INGBER: I can't ask her if she's aware whether or not Charlie Thomas has denied signing any contracts?

THE COURT: No. You cannot. You cannot do that, sir. Because this is out-of-court statements by a declarant who is not present for cross-examination.

You have every right to subpoena Mr. Thomas and bring him in here and let him say whatever he wants to say. You can bring in Mr. Hobbs, if he's still alive. He's passed on, hasn't he?

MR. FLYNN: As Mr. Green.

THE COURT: You can bring Charles Thomas in here to testify as to anything he wants to say. He can get on the stand and testify that he had an absolute right—

MR. INGBER: I—

THE COURT: Listen to me. He can come in here and testify he had an absolute right to transfer that to your client. He can tell us the reasons for those rights. But to read his deposition is improper.

MR. INGBER: I won't read the deposition. I don't see why I can't even ask her whether or not she is aware of whether Charlie Thomas has denied signing any contracts.

THE COURT: Doesn't matter.

MR. INGBER: It goes to her state of mind, your Honor.

THE COURT: Not her state of mind. Hers is not a state-of-mind question. Your client's state of mind is because he is being charged with fraud. His state of mind is an issue in the case. Her state of mind is not an issue in the case.

MR. INGBER: It also goes as to abandonment, your Honor. That is a state of mind issue [as] well.

THE COURT: It doesn't.

MR. INGBER: Abandonment is a state of mind. It is intent.

THE COURT: Intent to abandon. Done by objective facts. Not done by the testimony of Charlie Thomas.

That is my ruling.

(End of sidebar conference)

Trans. at 540–46.

This Court is satisfied that its ruling was correct. Charlie Thomas' out-of-court statement that he did not sign an employment contract with Treadwell's Drifters was inadmissible hearsay.

### c) Charlie Thomas' Employment Contract

The Court is satisfied that the photocopy of Charlie Thomas' employment contract with The Drifters Inc. (Trial Exh. D–19) was properly admitted into evidence.

As an initial matter, it was a stipulated fact in this case that "Dock Green, Elsbeary Hobbs and Charles Thomas each signed employment contracts with The Drifters, Inc." Pretrial Order, Stip. Fact No. 9. Mr. Marshak also testified that, by 1971, he had seen copies of this and other employment contracts between The Drifters, Inc. and his assignors. *See* Trans. at 98–102, 104, 108, 288.

■ At trial, this Court admitted the photocopy pursuant to Federal Rule of Evidence 1004, which provides: "The original is not required, and other evidence of the contents of a writing . . . is admissible if—(1) All originals are lost or have been destroyed, unless. the proponent lost or destroyed them in bad faith." *See* Trans. at 451–53.

Mrs. Treadwell testified that she had seen an original at one time, but that it was lost years ago.[28] *See* Trans. at 426–29, 451–53. She testified that she was able to get a copy, Exhibit D–19, from Atlantic Records.[29] *See id.* at 442. Marshak's lawyer conducted a *vior dire* of Mrs. Treadwell, and this Court also examined portions of her deposition taken in the re-

cently settled Queens royalty case. *See id.* at 444–52. After considering Mrs. Treadwell's live and deposition testimony on this subject, the Court concluded that she no longer had the original contract and that she did not lose it or destroy it in bad faith. *See id.* at 451–53. The photocopy was therefore admissible as "other evidence" under Rule 1004.

■ The photocopy was also admissible under Rule 1003, which provides: "A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original."

With respect to the first requirement, there was no genuine question of authenticity. Mrs. Treadwell identified Exhibit D–19 as a second-generation copy of the original contract that she had seen years earlier. She also testified that she recognized Charlie Thomas' signature. *See id.* at 426–29. Marshak did not challenge the authenticity of Charlie Thomas' signature; nor did he challenge the accuracy of the photocopy. Indeed, Marshak's sole objection to the admission of D–19 was that, in his opinion, Treadwell had not sufficiently established that all of the original contracts were lost or destroyed. But Marshak never disputed that D–19 was what Treadwell claimed it to be—i.e., a copy of an employment contract between Thomas and The Drifters, Inc. Marshak therefore failed to raise a genuine question as to the document's authenticity.

It was not unfair to admit the photocopy in this case because: (1) Marshak testified that he had seen copies of this and other similar contracts on several occasions since 1971; and (2) Marshak did not dispute the accuracy of the photocopy or the authenticity of Charlie Thomas' signature. *See* Trans. at 98–102, 104, 108, 288.

28. The record is not clear on this point, but it appears that the 1960 contract was either lost or destroyed in an office fire.

29. Treadwell testified that Atlantic Records' files contained copies of Drifters Inc. employment contracts, and that Exhibit D–19 was a photocopy of one of Atlantic's copies. *See* Trans. at 442–44.

This Court is therefore satisfied that the photocopy was admissible to the same extent as the original under Rule 1003,[30] and also admissible as "other evidence" of the contract under Rule 1004.

### 3. Newly Discovered Evidence

In support of his motion for a new trial, Marshak cites "newly discovered evidence" that Charlie Thomas once denied having signed an employment contract with The Drifters, Inc. The purported denial is contained in a pleading filed on behalf of Charlie Thomas in the recently settled royalty dispute. *See Thomas v. The Drifters, Inc.*, Index No. 25930/92 (N.Y. Sup.Ct., Queens Cty.), Charley [sic] Thomas's Response to Drifters Inc.'s Notice to Admit, attached as Exhibit 11 to Decl. of Mark J. Ingber. However, this Court has not considered the proffered document because it is not evidence and it is not new.

■ The Response to the Notice to Admit is not admissible evidence because the document is not signed or certified as true by Charlie Thomas; indeed it is signed only by Mr. Marshak's attorney, Lowell Davis.

■ The proffered document is not "new" within the meaning of Rule 59 because Marshak provides no reason why he could not with due diligence have located the pleading prior to trial. Moreover, the document is dated July 1, 1994 and it was written by Mr. Davis, who was in the courtroom during portions of this trial.

### 4. Comments by the Court

[24] Marshak contends that this Court improperly instructed the jury that Treadwell's 1971 New York suit had been dismissed on a "technical ground." This remark was made during the Court's limiting instruction:

It [the dismissal] is not binding upon you. But it is introduced into evidence

to show circumstances that Mr. Marshak has presented here concerning what he did and why he did certain things. It is not binding upon you. You should not accept it as binding upon you in your determination of the issues in this case. . . . [It was] dismissed . . . on a technical ground. It has nothing to do with the merits of the case.

Trans. at 721.

This instruction was proper because the New York court's decision was admissible only as it related to Marshak's claim that he and his assignors sincerely believed that no other person or entity had legal rights in the name "The Drifters" when they filed their trademark application in 1976. Moreover, this instruction was necessary in light of Mr. Ingber's improper opening statement, which quoted extensively from the New York court's ruling on Treadwell's 1971 preliminary injunction application. *See* Trans. at 42–43. Indeed, Mr. Ingber quoted the court's description and characterization of the evidence, and then quoted its conclusion: "Finally, the Court said, 'In fact, the evidence submitted apparently indicates that it is the defendants, Mr. Thomas, Mr. Hobbs, Mr. Green and Mr. Marshak, who have established such reputation and notoriety [in the name The Drifters].' " Trans. at 43 (opening statement by Mr. Ingber).

This Court is satisfied that its limiting instruction to the jury was both appropriate and necessary.

### III. Defendant Treadwell's Motions

#### A. Motion to Set Aside Jury's Finding of Abandonment

Although the jury found that Marshak's trademark had been obtained by fraud, and that Treadwell was the true owner of the mark, the jury also found that Treadwell had abandoned her rights.[31] Tread-

---

**30.** Exhibit D–19 was a copy of a document retrieved from Atlantic Records' files. That document was itself admissible under Rule 1003. It was also admissible under Rule 901(b)(8), because it was more than 20 years

old and found in normal condition and in a place where it would likely be.

**31.** The Court instructed the jury that a trademark owner "abandon[s] his rights to exclu-

well argues that a finding of abandonment is precluded, as a matter of law, by the uncontroverted evidence that she and her predecessors-in-interest have continuously received royalties from the commercial use of original Drifters recordings.[32]

The doctrine of "related use" was described for the jury as follows:

A change in use of a mark from one product to another will not constitute abandonment if the products also are closely related. That is, where a registrant discontinues to use a trademark on a certain product, he will not be held to have abandoned the mark if he continues to use the mark on related items, and if the discontinued product is one which would still be thought by the buying public to come from the same source and is one which remained in the normal field of expansion of the owner's business.

There is no abandonment or break in the chain of priority of use merely because use of the mark is shifted from one line of goods or services to another similar line. A change in the kind of goods or services marketed under the trademark is not an abandonment of the trademark owner's priority if prospective purchasers are likely to perceive the new product as originating from the same source as the former product.

Trans. at 766; *see* 2 McCarthy on Trademarks and Unfair Competition § 17:15. Marshak did not object to this instruction and he did not dispute that a musical group's recordings and live performances are parts of a single business enterprise in the public mind. *See Turner v. HMH Publishing Co., Inc.*, 380 F.2d 224, 228–29 (5th Cir.1967); *see also Giammarese v.*

*Delfino*, 197 U.S.P.Q. 162, 163 (N.D.Ill. 1977).

Treadwell cites *The Kingsmen v. K–Tel International, Ltd.*, 557 F.Supp. 178 (S.D.N.Y.1983). In that case, former members of the rock group "The Kingsmen" sought to enjoin another former member, Jack Ely, from suggesting to the public that his recent re-recording of the famous song "Louie, Louie" was performed by the original Kingsmen. Although there was no dispute that Ely was the lead vocalist on the original recording of "Louie, Louie," he had left the Kingsmen in 1964, before either the song or the group became popular. *See* 557 F.Supp. at 179–80.

Ely argued that his use of name "The Kingsmen" was permissible because, among other things, the mark had been abandoned to the public domain when the group disbanded in 1967 and ceased touring and recording songs. The district court rejected Ely's defense of abandonment because the other group members had continued to use the Kingsmen mark in connection with the sale of the group's original recordings. The court reasoned:

We find that defendants have failed to show either non-use or intent to abandon. Even though plaintiffs disbanded their group in 1967 and ceased recording new material, there is no evidence suggesting that they failed to use the name Kingsmen during the period from 1967 to the present to promote their previously recorded albums. Moreover, the fact that these individuals continue to receive royalties for Kingsmen recordings flies in the face of any suggestion of an intent to abandon use of the name

sive use of [a] trademark if he discontinues its use with an intent not to resume it. . . . The party asserting abandonment, here Mr. Marshak, has the burden of proving that abandonment occurred by a preponderance of the evidence. Under the Lanham Act, proof of non-use for two years creates a presumption that the mark has been abandoned." Trans. at 763–64.

**32.** At oral argument on the instant motions, Marshak argued for the first time that Treadwell's royalties are merely a "manager's share" and that she had granted a "naked license" to Atlantic Records. However, Marshak does not cite any evidence in the record in support of these contentions, and this Court has found none. Moreover, neither of these arguments were raised at trial and they are therefore waived.

Kingsmen. *These plaintiffs have no more abandoned their right to protect the name of Kingsmen than have The Beatles, The Supremes or any other group that has disbanded and ceased performing and recording, but continues to collect royalties from the sale of previously recorded material.*

557 F.Supp. at 183 (emphasis supplied); *see also HEC Enterprises, Ltd. v. Deep Purple, Inc.*, 213 U.S.P.Q. 991, 993 (C.D.Cal.1980)(holding that the original members of the musical group "Deep Purple" had not abandoned the name because they continued to receive royalties from the sale of their original recordings).

■■■■ This Court is persuaded by the *Kingsmen* case and subsequent cases that have adopted its reasoning. *See Robi v. Reed,* 173 F.3d 736 (9th Cir. 1999)("adopt[ing] the holdings of *HEC Enterprises, Ltd.* and *Kingsmen* "). A successful musical group does not abandon its mark unless there is proof that the owner ceased to commercially exploit the mark's secondary meaning in the music industry. It is insufficient merely to prove that the group stopped performing and recording new songs. In this case, Marshak had the burden to prove that Treadwell stopped using the mark in connection with the continued sale of original Drifters recordings. Marshak adduced no such evidence; indeed, it was stipulated that the original Drifters recordings have been played on the radio and sold in record stores, without interruption, for the past 40 years. *See* Pretrial Order, Stip. Facts 13–15; *see also* Trans. at 464. Therefore, the name "The Drifters" could never have passed into the public domain.

In this Court's judgment, there was no evidence in the record from which a reasonable jury could infer that Treadwell stopped using the mark in commerce. As a matter of law, there was no abandonment. The Court will therefore vacate the

jury's finding that Treadwell abandoned her trademark rights in 1976.[33] Because The Drifters mark never passed into the public domain, it is clear that neither Marshak nor his assignors could ever have acquired common law trademark rights. The jury's verdict will be modified accordingly.

## IV. Remedies & Attorneys Fees

Treadwell's trademark rights date back to 1954, when George Treadwell first acquired ownership and control of The Drifters. Larry Marshak has no legal rights in the mark.

The Court will permit the parties to file supplemental briefs so that they can address the issues of remedies and attorneys fees in light of today's decision. Plaintiff and defendant are to submit their respective briefs in accordance with the Order that accompanies this Opinion.

### *CONCLUSION*

For the foregoing reasons, Marshak's motions are DENIED. Treadwell's motion to set aside the jury's finding of abandonment is GRANTED.

An appropriate Order accompanies this Opinion.

### *ORDER ON POST–TRIAL MOTIONS*

**THIS MATTER** having come before the Court on cross-motions to set aside the jury's August 5, 1998 verdict; and the Court having heard oral argument on April 9, 1999 and having considered the parties written submissions; and for the reasons set out in the Court's Letter Opinion in the above-captioned matter;

**IT IS** on this 30th day of July, 1999,

ORDERED that Marshak's motion for judgment as a matter of law or, in the alternative, for a new trial be and hereby is DENIED; and it is further

---

**33.** This Court also makes the alternative finding, as required by Rule 50(c)(1), that the jury's finding of abandonment was against the great weight of the evidence and warrants a

new trial. *See Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 296 (3d Cir.1991).

ORDERED that Treadwell's motion for judgment as a matter of law or, in the alternative, for a new trial be and hereby is GRANTED; and it is further

ORDERED that this Court's FINAL JUDGMENT AND ORDER, entered September 30, 1998, be and hereby is MODIFIED as follows:

1. The jury's verdict that Treadwell abandoned her rights to the name "The Drifters" in or about 1976 is hereby VACATED AND SET ASIDE as contrary to law; and

2. The jury's verdict that Marshak acquired common law rights in the name "The Drifters" subsequent to 1976 is hereby VACATED AND SET ASIDE as contrary to law; and it is further

ORDERED that the jury's verdict and this Court's FINAL JUDGMENT AND ORDER remain unchanged in all other respects; and it is further

ORDERED that each party submit one supplemental brief as follows:

1. Briefs should address final remedies and attorneys fees only; and

2. Briefs are not to exceed 15 double-spaced pages, with 12-point size type and one-inch margins; and

3. Briefs are to be filed with the Court on August 9, 1999; and

4. Briefs are to be served on opposing counsel on August 11, 1999; and

5. There will be no reply briefs; and

6. There will be no extensions of time.