

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-2-2009

# Marshak v. Treadwell

Precedential or Non-Precedential: Precedential

Docket No. 08-1771

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Marshak v. Treadwell" (2009). *2009 Decisions.* Paper 902.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/902

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 08-1771
_____


LARRY MARSHAK

v.

FAYE TREADWELL; TREADWELL'S DRIFTERS, INC.;
THE DRIFTERS, INC.,

Appellants,


_____

No. 08-1836
_____

LARRY MARSHAK,

v.

FAYE TREADWELL; TREADWELL'S DRIFTERS, INC.;
THE DRIFTERS, INC.

LOWELL B. DAVIS,

Appellant,

_____

No. 08-1837
_____

LARRY MARSHAK

v.

FAYE TREADWELL; TREADWELL'S DRIFTERS, INC.;
THE DRIFTERS, INC.

LARRY MARSHAK; ANDREA MARSHAK;
PAULA MARSHAK; CHARLES MEHLICH;
BARRY SINGER; DCPM, INC.;
LIVE GOLD OPERATIONS INC; CAL CAP LTD;
BARRY SINGER; SINGER MANAGEMENT
CONSULTANTS, INC.; DAVE REVELS,

Appellants.

Appeal from the Order of the United States District Court
for the District of New Jersey

(No. 95-cv-3794)

District Judge: Honorable Dickinson R. Debevoise

2

Argued: Tuesday, March 10, 2009

Before: FUENTES, CHAGARES, and ALDISERT, <u>Circuit Judges</u>.

(Opinion Filed: July 2, 2009)

John A. DeMaro, Esq. [ARGUED]
Ruskin Moscou Faltischek, P.C.
1425 RexCorp Plaza
Uniondale, NY 11556

> <u>Attorney for Appellant-Cross Appellee Larry Marshak
> and Non-Party Appellants-Cross Appellees Andrea
> Marshak, Paula Marshak, Charles Mehlich, Barry
> Singer, Dave Revels, DCPM, Inc., Live Gold
> Operations, Inc., Cal-Cap Ltd., and Singer
> Management Consultants</u>

Jeffrey Schreiber
Meister, Seelig & Fein
2G Auer Court, Williamsburg Commons
East Brunswick, NJ 08816

> <u>Attorney for Barry Singer and DCPM Operations, Inc</u>.

Lowell B. Davis, Esq. [ARGUED]
One Old Country Road, Ste. 385
Carle Place, NY 11514

Pro Se

Cindy D. Salvo, Esq. [ARGUED]
The Salvo Law Firm, P.C.
101 Eisenhower Parkway, Ste. 300
Roseland, NJ 07068

Attorney for Appellees-Cross Appellants Faye
Treadwell, Treadwell's Drifters, Inc., and The Drifters,
Inc.

FUENTES, Circuit Judge.

For over a decade, Faye Treadwell ("Treadwell"), widow of the late music executive George Treadwell, and Larry Marshak ("Marshak"), a promoter of various doo-wop groups, have fought tooth and nail over the rights to use the trademark of "The Drifters," the legendary singing group. In the late nineties, Marshak sued Treadwell for infringement of a federally registered mark for The Drifters that Marshak had obtained in 1978. Treadwell counterclaimed to cancel the registration, arguing that the mark had been procured by fraud, and that Marshak was infringing on Treadwell's senior common-law rights. In August 1998, a jury issued a split verdict: it found that Marshak had procured his mark by fraud, but that Treadwell had abandoned her common law rights to the mark through inaction. However, approximately one year after the jury verdict, Judge Politan granted judgment as a matter of law for Treadwell. Marshak v. Treadwell, 58 F. Supp. 2d 551 (D.N.J. 1999). Judge

4

Politan agreed with the jury that Marshak had made misrepresentations to the Patent and Trademark Office, but determined that the mark had not been abandoned, as the music of The Drifters was still played on the radio and sold in stores. Marshak appealed Judge Politan's decision and we affirmed. Marshak v. Treadwell, 240 F.3d 184 (3d Cir. 2001).

The case now before us focuses on the breadth of the injunction and efficacy of the remedies that were issued along with Judge Politan's ruling. Judge Politan enjoined Marshak and his company from marketing The Drifters anywhere – not On Broadway, not Up On the Roof, and not Under the Boardwalk – and ordered a full accounting of profits. In the years that followed, however, various family members and associates of Marshak picked up where Marshak left off, and began again promoting The Drifters, just as Marshak had. Treadwell, thinking that these actions were not Some Kind of Wonderful, thus brought the instant motion for contempt, arguing that the Politan injunction applied to Marshak's associates as well as to Marshak. After a lengthy hearing, the District Court found that Marshak and his associates were in contempt of the Politan injunction, but limited Treadwell's remedies to an award of attorneys' fees. Both sides then appealed: Marshak and his associates appealed the merits of the decision, while Treadwell challenged the paucity of the remedies.

For the reasons that follow, we affirm in part and reverse and remand in part.

I.

A.

The dispute in this case centers on the trademark rights to The Drifters, a popular singing group from the 1950s and 1960s.[1]  The Drifters first appeared in 1953 and came under the management of George Treadwell the following year.  George Treadwell hired and paid the individual performers as employees, replacing them frequently.  For nearly two decades, The Drifters as an entity persisted, though the membership of the group was constantly in flux.  George Treadwell passed away in 1959, and his wife, Faye Treadwell, took over management of the group.

By 1970, The Drifters had largely ceased to perform in the United States, although their songs were still played on the radio.  Marshak, an editor for a rock magazine, saw this as an opportunity.  Working with CBS Radio, which had shifted to an "oldies" format, Marshak reunited some of the former members of the group – those who had been replaced over the years by the Treadwells – for a series of reunion concerts.  Capitalizing on the success of these concerts, Marshak signed the former members to exclusive management contracts and began marketing them as "The Drifters."

Over the next three decades, Marshak continued marketing The Drifters in the United States.  His efforts at

---

[1]The background facts of this dispute have been treated exhaustively by a previous panel of this Court.  Marshak, 240 F.3d at 187-90.

promotion were occasionally interrupted by trademark infringement litigation – Faye Treadwell sued Marshak, and Marshak in turn sued other Drifters promoters – but these lawsuits were often inconclusive.[2] By the late nineties, however, the litigation over The Drifters finally produced a decisive result: as described above, in July 1999, Judge Politan determined that Marshak had acquired his rights to The Drifters mark by fraud and that Treadwell's rights to The Drifters were superior. Marshak, 58 F. Supp. 2d at 568, 575. Judge Politan enjoined Marshak and his company, RCI Management ("RCI"), from promoting groups performing under the name of The Drifters, Marshak v. Treadwell, No. 95-CV-3794 (D.N.J. Aug. 16, 1999) (order of contempt, permanent injunction, and accounting) ("Politan Injunction"), and we affirmed, Marshak, 240 F.3d at 200.

With the issuance of the injunction, Marshak should have been out of The Drifters business. In the year and a half leading up to the issuance of this injunction, however, Marshak and his associates had begun to reorganize his promotion business in ways that complicated the effect of Judge Politan's injunction. It is the nature of this reorganization that lies at the center of the contempt proceeding now before us.

---

[2]Other classic singing groups with transitory memberships have undergone similar legal disputes. The trademark rights to The Duprees, a doo-wop group from Jersey City, have recently been the subject of litigation in New Jersey district courts. Charles Toutant, "The Duprees Play On, and So Does Dissonance Over Their Ownership," 195 N.J.L.J. 493, Feb. 23, 2009, at 21.

B.

In the years before the injunction was issued, Marshak promoted groups like The Drifters through RCI. Andrea Marshak, Marshak's wife, and Paula Marshak, Marshak's sister-in-law, both worked for RCI, as did Dave Revels ("Revels"). Charles Mehlich ("Mehlich") served as RCI's accountant, and Lowell Davis ("Davis") served intermittently as RCI's attorney. The business was run out of Marshak's basement.

Beginning in 1996, Marshak began to experience some health difficulties. According to Andrea Marshak, for the next year or so she and Paula Marshak handled much of the business of RCI, allowing Marshak to convalesce. Finally, in early 1998, after the work became too "overwhelming," they collectively decided to dissolve RCI and form a new company called DCPM, Inc. ("DCPM").[3] DCPM was officially formed on January 21, 1998, and was co-owned by Andrea Marshak, Paula Marshak, Mehlich, Revels, and Dave Backer ("Backer"). These same owners also formed Cal-Cap, a licencing corporation created to work alongside DCPM. DCPM was formed as a "sort of successor to RCI." (App. 229 (Marshak Decl.) ¶ 3.) It "basically picked up where RCI left off," (App. 519 (Paula Marshak Decl.) ¶ 5), and was "engaged in the same kind of singing group promotion business as . . . RCI," (App. 162 (Mehlich Decl.) ¶ 5). In addition, DCPM was operated out of the same offices in Marshak's basement that housed RCI.

---

[3]DCPM, Inc. was subsequently renamed DCPM Operations. For the purposes of this Opinion, we will refer to both companies as "DCPM."

8

For a brief period of time, RCI and DCPM coexisted. RCI's last show was in November of 1998 – over eight months after DCPM was formed – although RCI was not officially dissolved until March 2003. After the reorganization, Marshak was officially retained as an employee of DCPM, not as an owner.

In August 1998, six and a half months after DCPM was formed, the jury returned a verdict in Marshak v. Treadwell, the underlying case. Overall, the verdict was favorable to Marshak – although the jury found that Marshak had procured his Drifters trademark by fraud, the jury also found Treadwell had abandoned her common law rights to the mark through inaction. As a result, Marshak retained common law rights in The Drifters mark. Marshak's victory, however, was relatively short-lived. On July 30, 1999, approximately a year later, Judge Politan vacated the jury verdict and issued judgment in favor of Treadwell, rejecting the jury's finding that Treadwell had abandoned The Drifters mark.

Up until February 9, 2001, when the Politan Injunction was affirmed by a panel of this Court, The Drifters had been appearing nightly at the Sahara Hotel and Casino with The Platters and The Coasters. All three groups were provided by DCPM, which had been assigned Marshak's rights to The Drifters under his employment contract. Once the injunction became effective and Marshak lost his rights to The Drifters name, however, DCPM also lost its rights to The Drifters, and thus DCPM could only market The Platters and The Coasters. Shortly thereafter, the Sahara show closed – The Drifters were the biggest box office draw of the three groups, and the show could not survive with only The Platters and The Coasters.

9

Barry Singer, a longtime business associate of Marshak, had brokered the original deal between RCI and the Sahara prior to the issuance of the injunction. Once the injunction barred The Drifters from appearing with the Platters and the Coasters, Singer attempted to obtain independent rights to The Drifters name, even going so far as to negotiate with Treadwell. These efforts, however, were unsuccessful.

In August 2001, around the time that Singer was attempting to secure independent rights to The Drifters mark, Davis, who had previously worked as an attorney for Marshak, approached Mehlich, a co-owner of DCPM and Marshak's ex-accountant, and informed Mehlich that Odessa Hobbs, the widow of Elsbeary Hobbs, a past member of The Drifters, was interested in licensing the name "The Elsbeary Hobbs Drifters." According to Davis, Odessa Hobbs had settled with Treadwell, and could now license the trademark. Mehlich approached his partners at DCPM about this opportunity, but according to Mehlich, no one at DCPM thought it wise to pursue that particular license given the injunction against Marshak. Singer, however, was interested. Singer subsequently formed a new company, Singer Management, for the express purpose of acquiring the rights to The Elsbeary Hobbs Drifters. He invited Mehlich to come in as a co-owner of Singer Management. Mehlich agreed, becoming an owner of DCPM and Singer Management simultaneously. In October 2001, the deal was completed – Singer Management entered into a licence agreement with Odessa Hobbs to use The Elsbeary Hobbs Drifters mark. By early 2002, the old Sahara show was reunited, with The Platters and The Coasters now playing alongside The Elsbeary Hobbs Drifters.

On November 27, 2006, Treadwell filed a motion for contempt, alleging that Marshak and his associates had continued to infringe upon her Drifters mark in violation of Judge Politan's order. The District Court issued its contempt decision on September 7, 2007, and made the following holdings relevant to this appeal. <u>Marshak v. Treadwell</u>, No. 95-CV-3794, 2007 WL 2687454 (D.N.J. Sept. 10, 2007) ("Liability Opinion"). First, the District Court rejected the argument that Treadwell's action for contempt was precluded by laches. It observed that the delay in filing may have been inexcusable, but Appellants did not show prejudice by the delay, a required component of the equitable defense. Second, the District Court held that Treadwell did not relinquish her rights to The Drifters mark to Odessa Hobbs in the January 6, 1999 settlement. Third, the District Court held that Judge Politan's court order was valid, despite a 2004 decision rendered by the Trademark Trial and Appeal Board ("TTAB") holding that ex-Drifter Bill Pickney had superior rights to Treadwell. Finally, and most significantly for the purposes of this appeal, the District Court held that the injunction was enforceable against parties other than Marshak and RCI – specifically, the companies and employees connected to Marshak that continued to market The Drifters after the injunction issued.

On September 20, 2006, Appellants moved for reconsideration of the District Court's Liability Opinion.[4] The

_____

[4]This motion for reconsideration was subsequently amended to include a request for reconsideration of the District Court's subsequent supplementary order on damages. This aspect of the motion for reconsideration will be addressed in

11

District Court issued an opinion on February 13, 2008, addressing the motion for reconsideration. Marshak v. Treadwell, No. 95-CV-3794, 2008 WL 413312 (D.N.J. Feb. 13, 2008) ("Reconsideration Opinion"). For the most part, the Reconsideration Opinion endorsed the findings of the Liability Opinion. It did, however, make one significant change: it acknowledged that the previous Liability Opinion contained some factual inaccuracies. In the Liability Opinion, the District Court had inaccurately stated that DCPM was formed around the same time that RCI was dissolved, and that this took place coincident with the "unfavorable" jury verdict. In actuality, the jury verdict, which was a split decision, was arguably favorable to Marshak and was issued eight months after DCPM was formed. The District Court acknowledged these factual mistakes, but noted that these mistakes "[did] not affect . . . the Court's controlling findings and conclusions of law concerning the relationship of Marshak and the other Marshak movants." Marshak, 2008 WL 413312, at *8.

## II.

## A.

We review a district court's decision on a motion for contempt for abuse of discretion. Roe v. Operation Rescue, 54 F.3d 133, 137 (3d Cir. 1995). Reversal is therefore appropriate only where the decision "'is based on an error of law or a finding of fact that is clearly erroneous.'" Id. (quoting Harley-Davidson, Inc. v. Morris, 19 F.3d 142, 145 (3d Cir.

---

Section II.D of this Opinion.

1994)).[5]

B.

"A plaintiff must prove three elements by clear and convincing evidence to establish that a party is liable for civil contempt: (1) that a valid order of the court existed; (2) that the defendants had knowledge of the order; and (3) that the defendants disobeyed the order." Id. (internal quotation marks omitted).

As an initial matter, we reject Appellants' challenge to the validity of Judge Politan's injunction. As we have frequently stated, a party who is alleged to be in contempt of a court order may not challenge the substantive merits of that order within contempt proceedings. Roe v. Operation Rescue, 919 F.2d 857, 871 (3d Cir. 1990) ("[T]he validity of the order may not be collaterally challenged in a contempt proceeding for violating the order."); Halderman v. Pennhurst State Sch. & Hosp., 673 F.2d 628, 637 (3d Cir. 1982) ("There are strong policy reasons for limiting review, even in post-final judgment contempt proceedings, to matters which do not invalidate the underlying order."). In addition, there is no serious dispute that the various Appellants had knowledge of the order. Accordingly, the first two elements of the contempt standard are easily satisfied. This appeal, therefore, comes down to whether the District Court abused its discretion in finding the third element satisfied – that is, whether Appellants disobeyed the order upon a showing of clear and convincing evidence. We will review the District Judge's factual findings in this regard

---

[5]We have jurisdiction pursuant 28 U.S.C. § 1291.

13

for clear error.

Before reviewing the District Judge's factual findings, however, we must address a threshold matter. Appellants have challenged the District Court's basis for holding the non-parties to the injunction – essentially, each Appellant other than Marshak and RCI – in contempt of the Politan Injunction. Whether a party may be held in contempt by an injunction is governed by Federal Rule of Civil Procedure 65(d) ("Rule 65(d)"). Pursuant to Rule 65(d), the following persons may be bound by an injunctive order so long as they receive actual notice of the injunction:

> (A) the parties;
>
> (B) the parties' officers, agents, servants, employees, and attorneys; and
>
> (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).

Fed. R. Civ. P. 65(d)(2). "Rule 65(d) 'is derived from the common-law doctrine that a decree of injunction not only binds the parties [] but also those identified with them in interest, in "privity" with them, represented by them or subject to their control.'" Golden State Bottling Co. v. N.L.R.B., 414 U.S. 168, 180 (1973) (quoting Regal Knitwear Co. v. N.L.R.B., 324 U.S. 9, 14 (1945)); see also Alemite Mfg. Corp. v. Staff, 42 F.2d 832, 833 (2d Cir. 1930) (Hand., J.) (noting that a non-party may be punished for violating an injunction if that non-party is "legally

14

identified" with the enjoined party). Courts, however, have admitted a significant exception to the general maxim that only parties and their privies may be bound by an injunction: specifically, non-parties "guilty of aiding or abetting or acting in concert with a named defendant or his privy in violating the injunction. . . . may be held in contempt." Savarese v. Agriss, 883 F.2d 1194, 1209 (3d Cir. 1989) (internal citation and quotation marks omitted); Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 674 (3d. Cir 1999) ("One with knowledge of a court order who abets another in violating the order is surely in contempt."); Operation Rescue, 919 F.2d at 871 ("[T]hose who have knowledge of a valid court order and abet others in violating it are subject to the court's contempt powers."); Alemite, 42 F.2d at 832 ("[A] person who knowingly assists a defendant in violating an injunction subjects himself to civil as well as criminal proceedings for contempt. This is well settled law." (citing Ex Parte Lennon, 166 U.S. 548 (1897))). Without such an exception, defendants might "nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." Regal Knitwear, 324 U.S. at 14; Max's Seafood Cafe, 176 F.3d at 674 ("'The law does not permit the instigator of contemptuous conduct to absolve himself of contempt liability by leaving the physical performance of the forbidden conduct to others.'" (quoting Operation Rescue, 919 F.2d at 871)).

There is, of course, no doubt that Judge Politan's injunction applies to Marshak and his company, RCI – the

15

parties specifically named in the order.[6]   However, the other parties held in contempt by the District Court – Andrea Marshak, Paula Marshak, Revels, Mehlich, Davis, Singer, Singer Management, DCPM, and Cal-Cap – were not specifically named in Judge Politan's injunction. The question before the court, therefore, is whether the District Court provided a legally sound basis under Rule 65(d) for a finding of contempt against the non-parties to the injunction.

The District Court did delineate a basis under Rule 65(d) for holding each Appellant in contempt of the injunction.[7]   It

---

[6]The order signed by Judge Politan specifically enjoined "Marshak and his employees, assigns, licensees, agents, as well as any and all entities in which he owns any stake or over which he exerts any influence (including but not limited to RCI Management)" from using The Drifters mark. Marshak, No. 95-CV-3794 (D.N.J. Aug. 16, 1999).

[7]Appellants argue that Treadwell's initial motion papers included affidavits from individuals that were never called to testify during the hearing, and that the District Court's finding of contempt cannot be based on statements from individuals made unavailable for cross-examination. From our review of the relevant opinions, the District Court did not base its findings on any of these affidavits – not a single one is mentioned in its opinions. Rather, the District Court's opinions rely on the testimony of Appellants themselves and several witnesses who testified at the hearing and were available for cross examination. We see no indication that the evidence the District Court relied upon was in any way improper.

16

determined that Andrea Marshak, Paula Marshak, Mehlich, Revels, and Davis were subject to the injunction as employees/attorneys of Marshak and/or RCI; that Singer and Singer Management were liable for being in active concert or participation/aiding and abetting Marshak's violation of the injunction; and that DCPM and Cal-Cap were subject to the contempt powers as successors-in-interest to RCI. Putting aside (for a moment) the question of whether the facts bear out the District Court's holdings, we see no error in the basis chosen for holding Singer, Singer Management, DCPM and Cal-Cap in contempt. Singer and Singer Management were properly analyzed as parties in active concert or participation/aiding and abetting Marshak, and DCPM and Cal-Cap were properly analyzed as successors-in-interest. The problem, rather, is with the District Court's initial treatment of Andrea Marshak, Paula Marshak, Mehlich, Revels, and Davis as parties directly subject to the injunction as employees of Marshak and/or RCI. See Marshak, 2007 WL 2687454, at *9 ("[U]nder the language of both Rule 65 and Judge Politan's order, not only is Marshak directly enjoined, but also directly enjoined are Andrea Marshak, Paula Marshak, Mehlich, Revels, and Davis as servants, employees, or agents of Marshak in his business entity of RCI.").

The District Court's Liability Opinion misstated the chronology of events leading to the formation of DCPM. In that opinion, the District Court stated that "coincident with the August, 1998, unfavorable verdict returned against him in Marshak v. Treadwell, Marshak . . . dissolved RCI" and "[a]bout the time Marshak dissolved RCI, . . . Andrea, Marshak's wife, formed DCPM, Inc." Marshak, 2007 WL

17

2687454, at *10. This chronology of events, as acknowledged by the District Court in its Reconsideration Opinion, was incorrect. In actuality, DCPM was formed over six months before the jury rendered its verdict, and over eight months before RCI promoted its last show. Moreover, the jury verdict itself was not entirely unfavorable to Marshak – rather, only after Judge Politan's judgment as a matter of law, which was published nearly a year after the jury issued its verdict, did Marshak find himself without any legal rights to The Drifters mark.

The District Court issued its Reconsideration Opinion, in part, to correct these factual inaccuracies. It held, however, that those mistakes in fact did not affect the Court's "controlling findings and conclusions of law concerning the relationship of Marshak and the other Marshak movants . . . ." Marshak, 2008 WL 413312, at *4. Although the District Court did not specify why the factual mistakes in the liability opinion did not affect the judgment, we find no error in its conclusion. See Dandridge v. Williams, 397 U.S. 471, 475 n.6 (1970) ("The prevailing party may, of course, assert in a reviewing court any ground in support of his judgment, whether or not that ground was relied upon or even considered by the trial court."); Cospito v. Heckler, 742 F.2d 72, 78 n.8 (3d Cir. 1984) (same). While Andrea Marshak, Paula Marshak, Mehlich, Revels, and Davis could not be enjoined as employees of RCI – each had ceased to serve Marshak and RCI in an employment capacity more than a year prior to issuance of the injunction – as noted above, persons "in active concert or participation" with an enjoined party are also bound by the injunction, and may not aid or abet the violation of the injunction. See, e.g., Max's Seafood Cafe, 176

18

F.3d at 674. Therefore, it is not essential that Andrea Marshak, Paula Marshak, Mehlich, Revels, and Davis have been employees of RCI at the time that the injunction was issued to find themselves subject to the contempt powers of the court.

Having determined that there is an adequate legal basis for applying the contempt standard against each appellant, we now turn to the factual findings made by the District Court. We review the District Court's factual findings for clear error. Under such review, "[w]e accept the ultimate factual determination of the fact-finder unless that determination is either '(1) completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data.'" Frett-Smith v. Vanterpool, 511 F.3d 396, 400 (3d Cir. 2008) (quoting Krasnov v. Dinan, 465 F.2d 1298, 1302 (3d Cir. 1972)).

Reviewing the record in its entirety, we find ample support for the District Court's contempt findings against Marshak, Andrea Marshak, Paula Marshak, Mehlich, Davis, Singer, and Singer Management. Treadwell initiated these contempt proceedings on November 28, 2006. As the case progressed, Marshak decided to slowly dissolve RCI. His wife Andrea Marshak, who had long worked for RCI, immediately stepped into the breach and formed DCPM – a company that would essentially replicate the work of RCI. She then invited Paula Marshak, Mehlich, and Revels – all past employees of Marshak/RCI – to become co-owners of DCPM. In Paula Marshak's own words, DCPM "picked up where RCI left off" (App. 519 ¶ 5) – doing the same work as Marshak and RCI, only under a different name. Even the place of business stayed the same – DCPM, owned and operated by the same personnel that

19

previously ran RCI, found a home in Marshak's basement. Marshak, once the boss, was not "merely" an employee.

Up until the moment the injunction issued, DCPM continued to market The Drifters based on Marshak's presumed common law rights. Once the injunction issued, however, DCPM was banned from using the mark. Immediately, however, the parties scrambled to evade the injunction. Davis, Marshak's former attorney, approached Singer, the man who brokered the original Sahara show, about purchasing rights to The Drifters mark through Odessa Hobbs – ignoring the fact that Judge Politan had previously held that Hobbs had no rights to license the mark. Marshak, 2007 WL 2687454, at *18 (determining that the settlement with the widow of Elsbeary Hobbs "reflects nothing more than Treadwell's agreement to make certain royalty payments" and that Treadwell did not "disavow any rights or claims to the name 'Drifters'" (quoting Marshak v. Treadwell, 58 F. Supp. 2d at 564)).[8] Nevertheless,

---

[8] Appellants argue that by purchasing the rights to the "Elsbeary Hobbs Drifters" from Odessa Hobbs, they had a good faith basis for using The Drifters mark. We disagree. Judge Politan analyzed the documents generated by the settlement between Treadwell and Odessa Hobbs and did not find any indication that the settlement granted Odessa Hobbs a claim of ownership over The Drifters mark. Marshak v. Treadwell, 58 F. Supp. 2d at 564. Despite this finding, and our subsequent affirmance of Judge Politan's opinion, Davis brokered the sale of Hobbs's rights to Singer Management less than a year later, and Appellants rehash their argument that this settlement granted them an alternate means to use The Drifters mark. Like

20

Singer inked the deal and began marketing The Drifters through Singer Management, a company created specifically for this purpose. Then, shockingly, Singer invited Mehlich, a co-owner of DCPM, to become a co-owner of Singer Management, and

---

the District Court, Marshak v. Treadwell, 2007 WL 2687454, at *18, we see no evidence to warrant disturbing Judge Politan's analysis of the trademark rights generated by the settlement.

We also reject Appellants' argument that the 2004 decision by the Trademark Trial and Appeal Board ("TTAB") in the case of Willie B. Pinkney v. Treadwell's Drifters, Inc., Opp'n No. 91151984, 2004 WL 2368485 (TTAB Sept. 24, 2004), somehow changed the landscape of this case. In that proceeding, Pinkney, a former Drifter, successfully argued that he had continuously used The Drifters mark prior to Treadwell. Appellants argue that a consent agreement between Marshak and Pinkney signed in 1981 placed Marshak in privity with Pinkney, and thus once Pinkney was granted rights to use the mark, Marshak also was entitled to use the mark. As noted by the District Court, the truth is "precisely the opposite." Marshak, 2007 WL 2687454, at *20. The consent agreement signed by Marshak and Pinkney stated that Marshak was the legal holder of The Drifters mark, but granted Pinkney the right to use the mark during Pinkney's lifetime. (App. 465-66.) Accordingly, the only trademark rights discussed in the consent agreement were those held by Marshak, which were subsequently invalidated by Judge Politan as being procured by fraud. Like the agreement with Odessa Hobbs, the consent agreement with Pinkney does not offer Appellants an alternate basis for using The Drifters mark.

21

moved the operation to – where else? – Marshak's basement. Thus, after a year's interlude, The Drifters were once again being marketed out of the same basement office by the same people.

Over the next few years, the various denizens of Marshak's basement gave lie to the notion that DCPM and Singer Management were separate and distinct entities. Singer Management and DCPM shared the same office and phone number. Inquiries by a private investigator revealed that principals of DCPM – not Singer Management – would willingly quote prices for The Drifters and fax out employment contracts, behavior that DCPM's owners unconvincingly described as "unintentional." DCPM even sent out media kits advertising the services of a suite of performers that included The Drifters.

The District Court credited significant evidence to this effect, both circumstantial and direct, in holding that Marshak and the principals of DCPM and Singer Management had reassembled Marshak's business under different names in order to evade the Politan Injunction. We see no clear error in this determination.

Likewise, we find no clear error in the District Court's holding that DCPM and Cal-Cap were successors in interest to, or a mere continuation of, RCI. The District Court applied New Jersey law, citing Bowen Engineering v. Estate of Reeve, 799 F. Supp. 467 (D.N.J. 1992):

> In determining whether or not successor liability should be imposed, "[i]t is the duty of the

court to examine the substance of the transaction to ascertain its purpose and true intent." Factors relevant to the "mere continuation" exception include continuity of ownership; continuity of management; continuity of personnel; continuity of physical location, assets and general business operations; and cessation of the prior business shortly after the new entity is formed. Also relevant is the extent to which the successor intended "to incorporate [the predecessor] into its system with as much the same structure and operation as possible." Thus the court should determine whether "the purchaser holds itself out to the world as the effective continuation of the seller." However, the proponent of successor liability need not necessarily establish all of these factors.

Bowen, 799 F. Supp. at 487-88 (internal citations omitted and

23

alterations in original).[9]  Although certain factors weighed
against finding DCPM and Cal-Cap to be successors to RCI –
namely, the changes in ownership and management – the
majority of factors clearly weighed in favor of finding DCPM
and Cal-Cap to be successors in interest to RCI: the personnel
of each business were the same, the location of each business
was the same, the assets of each business were the same, the
general operations of each business were the same, and RCI
folded shortly after DCPM was formed.  Considering the record
as a whole, we find no clear error in the District Court's
determination that DCPM and Cal-Cap were formed to replace
and continue the work of RCI, nor any error with the District
Court's concomitant decision to hold DCPM and Cal-Cap in

---

[9]Appellants argue that the district judge ignored their
argument that New York law, not New Jersey law, should have
been applied.  We find no error in the District Court's decision
to employ New Jersey law.  We note, however, that the
differences between the New Jersey and New York law on this
subject are minimal, and would not have affected the outcome.
Compare Bowen, 799 F. Supp. at 487-88 with Nettis v. Levitt,
241 F.3d 186, 193-94 (2d Cir. 2001) (noting that in determining
whether a business is the "mere continuation" of another,
"courts consider (1) continuity of ownership; (2) cessation of
ordinary business by the predecessor; (3) assumption by the
successor of liabilities ordinarily necessary for continuation of
the predecessor's business; and (4) continuity of management,
personnel, physical location, assets, and general business
operation"), overruled on other grounds by, Slayton v. American
Express Co., 460 F.3d 215 (2d Cir. 2006).

contempt. See Walling v. James V. Reuter, Inc., 321 U.S. 671, 674 (1944) ("[A]n injunction enforc[ea]ble by contempt proceedings against the corporation, its agents and officers and those individuals associated with it in the conduct of its business, but it may also, in appropriate circumstances, be enforced against those to whom the business may have been transferred, whether as a means of evading the judgment or for other reasons." (internal citations omitted)); G. & C. Merriam Co. v. Webster Dictionary Co., 639 F.2d 29, 40 (1st Cir. 1980) ("A party and his privies cannot circumvent a court's injunction against the activities they had effectuated before the injunction, through one legal entity, by the creation of another entity through which they, or some of them, continue essentially the same activity.").

C.

Although we largely uphold the District Court's contempt determinations, we will reverse its findings in regard to Dave Revels. Revels, a principal of DCPM, was the individual who mailed out media kits to entertainment producers offering the services of The Drifters. In respect to his conduct, he is like the other principals of DCPM, each of whom were properly held in contempt by the District Court. Our concern, rather, is with the procedure by which he was held in contempt.

Revels, like the other DCPM principals, was not named in the injunction. As noted above, this itself is not a barrier to a finding of contempt. The key difference separating Revels from the other DCPM principals, however, is that Treadwell never actually moved for Revels to be held in contempt. Revels became involved in this proceeding as a witness for Appellants.

25

See Marshak, 2007 WL 2687454, at *4 (noting that Revels testified on behalf of Appellants). In so testifying, Revels revealed an involvement in the business of DCPM that led the District Court to include him among the parties held in contempt.

We have two concerns with the process employed by the District Court. First, we are troubled by the District Court's failure to acknowledge that it was holding a non-party to the proceeding liable for contempt. While there is ample authority holding that a district court may issue a finding of contempt against a non-party, courts that do so typically acknowledge the unique status of the non-party, and specifically note the authorities that permit such exercise of judicial power. See Operation Rescue, 54 F.3d at 140 (reversing trial court's non-imposition of contempt by non-parties, but noting that the trial court acknowledged the non-party status of would-be contemnors and acknowledged the court's power to hold such an individual in contempt); Roe v. Operation Rescue, No. 88-CV-5157, 1988 WL 131407, at *1, *4 (E.D. Pa. Dec. 6, 1988) (same), aff'd in relevant part, 919 F.2d 857 (3d Cir. 1990). Although we do not presume that the District Court misunderstood the step it was taking in holding Revels liable for contempt, nor that it inadvertantly considered Revels a proper defendant, the record does not reveal any overt acknowledgment that Revels's status was, in fundamental respects, different than the other DCPM principals.

Second, and more significantly, we reverse based on the lack of notice tendered to Revels prior to the finding of contempt. Treadwell initiated this contempt proceeding against

26

some, but not all, of the principals of DCPM.[10] Treadwell never moved for a finding of contempt against Revels; Revels only appeared in this proceeding as a witness. In Quinter v. Volkswagen of America, we upheld a finding of contempt against a non-party witness for violation of court order. 676 F.2d 969, 974 (3d Cir. 1982). In that case, however, the aggrieved party specifically moved for a finding of contempt against the witness, putting him on notice of his potential liability and triggering a hearing. Id. at 972 (noting that Volkswagen filed a motion for sanctions against Bloch after he deliberately divulged evidence placed under protective order); see also Latrobe Steel Co. v. United Steelworkers of Am., AFL-CIO, 545 F.2d 1336, 1343-44 (3d Cir. 1976) ("Civil contempt proceedings are instituted primarily on the motion of the plaintiff . . . ."). This is no trivial detail. "Due process requires that a potential contemnor be given notice and a hearing regardless of whether the contempt is civil or criminal in nature." Newton v. A.C. & S., Inc., 918 F.2d 1121, 1127 (3d Cir. 1990) (citing In re Grand Jury Proceedings, 795 F.2d 226, 234 (1st Cir. 1986)); Harris v. City of Philadelphia, 47 F.3d 1311, 1322 (3d Cir. 1995) (noting that before a district court may issue a finding of contempt for failure to obey a court order, "it is appropriate to give notice by an order to show cause and to hold a hearing"); Roe v. Operation Rescue, 920 F.2d 213, 217 (3d Cir. 1990) (noting that due process requires, before imposition of a finding of civil contempt, "an opportunity

_____

[10]Revels was not the only principal of DCPM omitted from Treadwell's complaint – Dave Backer was similarly excluded.

27

granted at a meaningful time and in a meaningful manner for a hearing appropriate to the nature of the case."); see Max's Seafood Cafe ex rel Lou-Ann, Inc., v. Quinteros, No. 90-CV-2137, 1997 U.S. Dist. LEXIS 23597, at *30 n.2 (D.N.J. Dec. 18, 1997) (refusing to issue finding of contempt against non-party because non-party only appeared as a witness and was not represented by counsel at the hearing), rev'd on other grounds, 176 F.3d 669. "These customary procedural safeguards ensure that the parties or their attorneys have an opportunity to explain the conduct deemed deficient before the fine is imposed and that a record will be available to facilitate appellate review." Newton, 918 F.2d at 1127 (citing Eash v. Riggins Trucking Inc., 757 F.2d 557, 571 (3rd Cir. 1985) (en banc)).

Although Revels was intimately involved in DCPM's activities, he was never made a target of the contempt proceedings: he was deliberately excluded from Treadwell's initial motion, and Treadwell never subsequently moved to include him, even after his testimony evinced potentially contemptuous behavior. As a result, Revels never obtained counsel (or otherwise sought to defend himself within the proceedings) or received a separate hearing. We do not question a district court's ability, in certain circumstances, to issue findings of contempt sua sponte. See, e.g., In re Grand Jury Proceedings, 795 F.2d at 234 ("There is general agreement that due process requires that a potential contemnor be given notice and a hearing regardless of whether the contempt is civil or criminal in nature, unless the contempt is committed in open court and tends to 'demoralize' the court's authority, in which case punishment can be imposed summarily." (citing inter alia In re Oliver, 333 U.S. 257, 274 (1948) (noting that "courts have

28

long exercised a power summarily to punish certain conduct committed in open court without notice, testimony or hearing")). However, on the facts of this case, it was inappropriate to hold Revels in contempt without notice and a hearing.[11]

## D.

Finally, we address the issue of remedies. In its September 7, 2007 Liability Opinion discussed above, the District Court did not address the issue of remedies – the decision held Appellants in contempt, but remained silent on damages. Following the entry of the decision on liability,

---

[11]Appellees cite two cases, Chambers v. NASCO, Inc., 501 U.S. 32 (1991) and Helmac Products Corp. v. Roth Plastics Corp., 150 F.R.D. 563, 569 (E.D. Mich. 1993), which speak to the wide contempt powers of a district court. In both Chambers and Helmac, however, the non-parties held in contempt received notice and a hearing, unlike Revels in the instant case. Chambers, 501 U.S. at 57 ("As long as a party receives an appropriate hearing, as did Chambers, the party may be sanctioned for abuses of process occurring beyond the courtroom, such as disobeying the court's orders." (internal citation omitted)); Helmac, 150 F.R.D. at 569 (noting that the court "will provide [the non-party accused of contempt] with the opportunity to testify or provide other witnesses at an evidentiary hearing that focuses on his role in the document destruction process and the appropriateness of sanctions against him."). Accordingly, these cases – if anything – support the position that a contempt violation may not issue against Revels without notice and a hearing.

29

Treadwell submitted a draft order to the District Court recommending a full accounting, treble damages, attorneys' fees and costs, and an inclusion of Live Gold Operations (DCPM's new name) as a defendant. Appellants responded by informing the Court that they wished to move for reconsideration of the merits of the liability opinion, and thus requested that the Court hold off on entering any supplementary order on remedies until the reconsideration motion had been decided. They filed this reconsideration motion on September 20, 2007. The District Court apparently rejected Appellants' request, however, as it signed the proposed supplementary order on September 25, 2007 ("Supplementary Order") without a hearing or a substantive response by Appellants. Appellants promptly amended their motion to request reconsideration of both the September 4, 2007 Order and Opinion and the September 25, 2007 Supplementary Order.

On February 13, 2008, the District Court issued its Reconsideration Opinion. Marshak, 2008 WL 413312. This Opinion, as noted above, acknowledged certain factual mistakes regarding the timing of the formation of DCPM, but stated that those errors did not affect the court's controlling findings and conclusions of law as expressed in the September 7, 2007 Opinion and Order. Id. at *4. Accordingly, the liability portions of the court's September 7, 2007 Opinion and Order were left undisturbed. The District Court did, however, use the Reconsideration Opinion as an opportunity to alter the remedies provided for in the September 25, 2007 Supplementary Order. The court acknowledged that the Supplementary Order had been entered without a hearing or a formal response from Appellants, and thus treated the portion of the reconsideration motion

30

addressing remedies as a "full scale opposition" to the relief accorded by the Supplementary Order, brushing away "the usual limitations imposed upon a motion for reconsideration." Id. at *9. In a sense, the court wound back the clock, and contemplated anew the issue of remedies as if the Supplementary Order had never been issued.

Reassessing the issue of remedies, the court removed the mandated accounting and treble damages, leaving in place only the attorneys' fees. Although the District Court acknowledged that certain factors supported an accounting of profits, it decided against imposing such a remedy. The District Court was less equivocal in its decision to remove the treble damages, stating that treble damages would be an "unjustified windfall" for Treadwell, and would not have been appropriate even if an accounting had been ordered. Id. at *8. The only remedy left standing was the attorneys' fees, which the court deemed justified to cover Treadwell's costs in securing the adjudication of contempt.

As in our discussion of the District Court's decision on liability, we review the sanctions imposed by the District Court for abuse of discretion. Robin Woods Inc. v. Woods, 28 F.3d 396, 399 (3d Cir. 1994) ("'The standard of our review of a district court sanction for civil contempt is whether the district court abused its wide discretion in fashioning a remedy.'" (quoting Del. Valley Citizens' Council v. Pennsylvania, 678 F.2d 470, 478 (3d Cir. 1982))). Here, however, we find that the District Court did abuse its discretion in refusing to impose any remedy other than attorneys' fees.

"Sanctions for civil contempt serve two purposes: 'to

31

coerce the defendant into compliance with the court's order and to compensate for losses sustained by the disobedience.'" Robin Woods, 28 F.3d at 400 (quoting McDonald's Corp. v. Victory Invs., 727 F.2d 82, 87 (3d Cir. 1984)). "Compensatory awards seek to ensure that the innocent party gets the benefit of the injunction . . . ." Id.

In the original iteration of this case, Judge Politan ordered fairly substantial remedies. After holding that Marshak had violated Treadwell's common law rights, see Marshak, 58 F. Supp. 2d 551, Judge Politan issued a separate order on remedies, holding that Marshak's infringement warranted a comprehensive injunction, a full accounting of profits, and reasonable attorneys' fees, Marshak, No. 95-CV-3794 (D.N.J. Aug. 16, 1999). These remedies comported with the relevant provisions of the Lanham Act: subject to "the principles of equity," Treadwell was entitled to recover Marshak's profits, any damages she suffered, the costs of the action, and, upon a showing of exceptional circumstances, attorneys' fees. 15 U.S.C. § 1117(a) (detailing remedies available to plaintiffs establishing violations under 15 U.S.C. § 1125(a)).[12]

---

[12]On appeal, Marshak challenged both Judge Politan's decision on liability as well as the remedies he imposed. We subsequently upheld the merits of Judge Politan's liability decision, but declined to review the supplemental order mandating the full accounting. Writing for the Court, Judge Alito stated that review of the order of accounting would be outside the scope of our jurisdiction, as the damages in question were insufficiently specific to amount to a final decision. Marshak, 240 F.3d at 190-91 (noting that while appellate review

Nearly a decade later, the same parties were back in court – this time in front of Judge Debevoise. We have already addressed in detail what happened in the years between Judge Politan's injunction and Judge Debevoise's finding of contempt: Marshak's family members and associates continued engaging in essentially the same business that they operated prior to the injunction, only this time without Marshak as the acknowledged ringleader. The District Court summed up their behavior succinctly in its Liability Opinion:

> Marshak, the Motion Respondents, and Davis have violated the letter, as well as the spirit and intent, of Judge Politan's injunction by engaging in an elaborate shell game through their creation of various business identities in an attempt to deceive Treadwell and the Court. All of them were aware of the injunction, but all of them benefitted financially from their violation of the injunction because The Coasters, The Platters, and The

---

is available in the case of an order that "is not technically final but resolves all issues that are not purely ministerial, the accounting at issue in this case does not come within that rule" (internal citations omitted)). We noted that consideration of the propriety of the remedies chosen by Judge Politan would have to await the completion of the accounting of profits – which, as we note later in this Opinion, apparently never occurred.

33

Drifters, when packaged together, make more money for them. Prior to the injunction The Drifters, The Coasters, and The Platters performed at the Sahara in Las Vegas through the efforts of Marshak and the servants, employees, and agents of Marshak's company, RCI-Andrea, Paula, Revels, Mehlich, and Davis. After the injunction, The Elsbeary Hobbs Drifters resumed performing with The Coasters and The Platters at the Las Vegas Sahara, through the active efforts of Marshak, Andrea, Paula, Revels, Mehlich, and Davis. Each of them has continued to sell, promote and advertise The Drifters through their own company, DCPM, and through the company formed exclusively for this purpose by Barry Singer and Mehlich, Singer Management. Their efforts continued after the Court of Appeals affirmed the District Court's order, in spite of their declarations to the contrary.

Marshak, 2007 WL 2687454, at *15. Despite laying out the evidence of this infringing conduct – and describing it as an

34

"elaborate shell game" crafted to evade the injunction – the District Court imposed remedies far less severe than those issued by Judge Politan. Marshak and his associates were sanctioned for violating the court's injunction, but were permitted by the court to keep whatever profits they gained as a result of their disregard for Judge Politan's injunction. This, we believe, was an abuse of discretion.

The District Court offered two reasons for declining to impose an accounting of profits: first, because Treadwell had not established that she suffered actual damages, and second, and "more important[ly]," because Treadwell waited five years before commencing the contempt action. Marshak, 2008 WL 413312, at *9. We will address these reasons in turn.

We have held that an accounting of an infringer's profits is available "if the defendant is unjustly enriched, if the plaintiff has sustained damages, or if an accounting is necessary to deter infringement." Banjo Buddies, Inc. v. Renosky, 399 F.3d 168, 177-78 (3d Cir. 2005) (emphasis added). In so holding, we have emphasized the "or" in this construction – noting that because "[t]hese rationales are stated disjunctively; any one will do." Id. at 178. Accordingly, Treadwell did not need to establish actual damages to justify the imposition of an accounting of profits[13] – she needed only to show that an accounting was necessary to deter infringement or that Marshak and his associates were

_____

[13] Although the District Court said the lack of proven damages "weigh[ed] heavily" against Treadwell, it also acknowledged that Treadwell was "not required to show actual harm." Marshak, 2008 WL 413312, at *8-9.

unjustly enriched. We think Treadwell easily satisfies this standard.

The record and the District Court's opinion are quite clear that the initial injunction and accompanying remedies did not deter the subsequent infringement by Marshak and his associates. To the contrary, to quote the District Court, Appellants engaged in an "elaborate shell game" to evade the restrictions of the injunction, and continued operating as they did prior to the court order. Marshak, 2007 WL 2687454, at *15; see Harley-Davison, 19 F.3d at 148-49 (noting that intent and wilfulness are not necessary elements of civil contempt, but are relevant regarding the extent of the sanction to be imposed). Given that the injunction imposed by Judge Politan did not have the desired effect, and given that the District Court made specific findings attesting to Appellants' efforts to avoid that injunction, we see little basis for limiting Treadwell's remedies to the imposition of attorneys' fees. See Banjo Buddies, 399 F.3d at 178 (noting that permitting an infringer to retain the profits from his or her infringement would not serve the congressional purpose of making infringement unprofitable).

We believe that limiting Treadwell's remedies to mere attorneys' fees would result in the perversity of imposing less demanding remedies on Appellants after the finding of contempt than were imposed before the finding of contempt. Compare Marshak, No. 95-CV-3794 (D.N.J. Aug. 16, 1999) (imposing injunction, accounting of profits, and attorneys' fees for Marshak's infringement of Treadwell's marks) with Marshak, 2008 WL 413312 (imposing attorneys' fees for violation of previous injunction). Moreover, to the extent that Appellants argue that such an accounting would result in a windfall for

36

Treadwell, we believe it to be more equitable that Treadwell, rather than Marshak and his associates, receive the benefits of the infringement. See Banjo Buddies, 399 F.3d at 178 ("Even if Banjo Buddies receives a windfall in this case . . . it is preferable that Banjo Buddies rather than Renosky receive the benefits of Renosky's infringement."). The principles of deterrence would not be served by permitting Marshak and his associates to keep the fruits of their contempt when they have evaded the injunction for more than half a decade.

The District Court's second basis for denying an accounting – the "more important" reason – was that Treadwell waited five years before commencing her action, despite knowing that Marshak and his associates were using the Elsbeary Hobbs Drifters trademark during the time period following the injunction. Marshak, 2008 WL 413312, at *9. The District Court held that this "inordinate delay" barred her from entitlement to an accounting of profits. Id.[14]

---

[14]Appellants also argued that the District Court should have barred the claim under the equitable doctrine of laches. "Laches bars an action from proceeding if there was (1) an inexcusable delay in bringing suit, and (2) material prejudice to the defendant as a result of the delay." Joint Stock Soc. v. UDV N. Am., Inc., 266 F.3d 164, 185 n.12 (3d Cir. 2001) (citing Pappan Enter. v. Hardee's Food Sys., 143 F.3d 800, 804 (3d Cir. 1998)). As noted by the District Court, Appellants never made any real effort to show prejudice – at best, they merely demonstrated a delay – and we do not find that delay inexcusable.

The only authority presented by the District Court to support this holding is <u>University of Pittsburgh v. Champion Prods., Inc</u>., 686 F.2d 1040, 1044-45 (3d Cir. 1982). In <u>University of Pittsburgh</u>, the University sued Champion Products, a manufacturer of athletic apparel, for trademark infringement. <u>Id</u>. at 1041. Champion presented the affirmative defense of laches, arguing that because Champion had been marketing clothing with the University of Pittsburgh logo for nearly fifty years, the University of Pittsburgh should have been estopped from proceeding on its claim. Although we reversed the district court's decision to apply laches, we held that the district court did not abuse its discretion in barring an accounting of profits for past infringement. <u>Id</u>. at 1045-46. In so doing, we analogized the fact pattern of <u>University of Pittsburgh</u> to the "common situation in which the plaintiff's less egregious delay will bar its claim for accounting for past infringement but not for prospective injunctive relief." <u>Id.</u> at 1044.

The case before us is readily distinguishable from <u>University of Pittsburgh</u>. The defendant in <u>University of Pittsburgh</u>, Champion Products, was not violating a previously imposed injunction. To the contrary, Champion had been using the University's name and logo for nearly <u>fifty years</u>, and had sold its products in the University's bookstore with the University's consent. <u>Id</u>. at 1043. We affirmed that the accounting of profits was not warranted, as the University had essentially acquiesced to Champion's commercial activities for nearly a half-century. <u>Id</u>. at 1045-46. The case before us here is far different. Treadwell did not consent to the present infringement – to the contrary, she has approached us seeking to

38

enforce a injunction that she had previously pursued and been granted. The long and tortured history of this case attests to the fact that Treadwell has not acquiesced to Marshak's activities. Given the progress of this case, Appellants cannot argue that they relied on some right to violate the injunction, nor that they were prejudiced for being permitted to violate the injunction longer than expected.

Appellants make much of the five year delay between our affirmance of Judge Politan's injunction and Treadwell's initiation of contempt proceedings (a span of time one-tenth the length of the delay in University of Pittsburgh). While Appellants may be correct in stating that Treadwell did not need to wait until Marshak's bankruptcy proceedings were resolved to move for an order of contempt, we do not think her choice to do so was "inordinate" or inexcusable, particularly in light of the prior history of this case. As noted above, the original injunction imposed by Judge Politan was itself accompanied by an order of accounting. Our review of the record, however, indicates that the order of accounting was never satisfied. Treadwell states that the order of accounting was rendered utterly ineffective by Marshak's subsequent bankruptcy proceedings, which did not become final until July 14, 2006, some four and a half years after the injunction was issued. Appellants do not contest Treadwell's version of the facts surrounding Marshak's bankruptcy, and we see nothing in the record to indicate that the accounting was ever satisfied.[15] We

___

[15]On July 12, 2001, Magistrate Judge Ronald Hedges signed a case management order directing Marshak to turn over all relevant financial documents for the order of accounting by

July 20, 2001. (No. 95-CV-3794, Dkt. No. 179.) On August 21, 2001, Treadwell submitted an affidavit from Yskla Adaikia'hanna, stating that the documents submitted by Marshak were inadequate for determining the profits earned by Marshak from The Drifters mark during the relevant time period. (No. 95-CV-3794, Dkt. No. 180.) A second case management order was then signed on September 6, 2001, which set a status conference for November 15, 2001. (No. 95-CV-3794, Dkt. No. 181.) A revised second case management order then issued on October 5, 2001, setting a hearing for November 5, 2001 on the issue of attorneys' fees. (No. 95-CV-3794, Dkt. No. 185.) However, before either conference took place, Marshak filed for bankruptcy on or about October 22, 2001. The case was administratively terminated shortly thereafter. (No. 95-CV-3794, Dkt. Nos. 186-87.)

Treadwell's first filing in the contempt proceeding before Judge Debevoise stated the following:

> On or about October 22, 2001, in an apparent attempt to avoid an accounting and an assessment of damages, Marshak filed a voluntary petition for Chapter Seven bankruptcy in the Eastern District of New York. As a result, Marshak avoided paying Treadwell untold damages illegally earned by him between 1970 and 2001.

40

do not think it inexcusable for Treadwell to wait for the resolution of the bankruptcy proceedings – and thus the disposition of the previous order of accounting – before addressing the second wave of infringement through a contempt proceeding.

For the aforementioned reasons, we will remand for an order of accounting.  We leave undisturbed the award of attorneys' fees.  We express no opinion on the propriety of treble damages, but instead leave that issue to the sound discretion of the District Court.

III.

For the foregoing reasons, we affirm the District Court's finding of contempt against Marshak, Andrea Marshak, Paula Marshak, Mehlich, Davis, Singer, Singer Management, DCPM, and Cal-Cap, but reverse as to Revels.  We affirm the award of attorneys' fees but remand for an order of accounting.

---

(No. 95-CV-3794, Dkt. No. 188).  Marshak never rebutted this account.